UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Joseph Norgren,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>Minnesota Department of Human Services and Commissioner Jodi Harpstead, in her individual capacity,<br><br>　　　　　Defendants. | **JURY TRIAL DEMANDED**<br>Court File No. 22-cv-00489 (ADM/HB) |

### FIRST AMENDED COMPLAINT[1]

Plaintiff Joseph Norgren, as and for his First Amended Complaint against the Minnesota Department of Human Services, states and alleges as follows:

### PARTIES

1. Plaintiff Joseph Norgren is a natural person who resides at 121 Main Street East, Apartment # 2, New Prague, Minnesota 56071.

2. Defendant Minnesota Department of Human Services is a governmental entity with a principal place of business at 444 Lafayette Road, Saint Paul, Minnesota 55155.

3. Defendant Jodi Harpstead is and was the Commissioner of the Minnesota Department of Human Services at all relevant times.

---

[1] Plaintiff hereby amends his Complaint once as a matter of course, pursuant to Fed. R. Civ. P. 15(a)(1)(B).

1

## JURISDICTION AND VENUE

4. This Court has jurisdiction over Plaintiff's 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964 claims pursuant to 28 U.S.C. §§ 1331 and 1343 because they arise under the Constitution and laws of the United States.

5. This Court has supplemental jurisdiction over Plaintiff's Minnesota Human Rights Act claims pursuant to 28 U.S.C. § 1367.

6. Venue is proper in this District under 28 U.S.C. § 1391 because Defendants resides in this District and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

7. Joseph Norgren is a Christian and is fifty percent (50%) Native American, specifically Ojibwe of the Red Lake Nation. Norgren's grandparents and mother grew up on the Red Lake Reservation in Minnesota.

8. Growing up, Norgren was subjected to racial slurs and other discriminatory behavior as a result of his Native American heritage. This upbringing has informed and impacted many of his beliefs.

9. Norgren was employed as a Security Counselor with the Minnesota Security Hospital ("Security Hospital"), which is part of the Minnesota Department of Human Services ("DHS"). The Security Hospital is located at 100 Freeman Drive, St. Peter, Minnesota 56082.

10. Norgren was employed by DHS for twenty-seven (27) years. He took a short break from the Security Hospital to serve in the Federal Bureau of Investigations ("FBI") for three years, but then returned to the Security Hospital after such service.

11. Norgren's son, Aaron, also works at the Security Hospital as a Security Counselor.

12. In August 2020, while working his shift, Norgren's supervisor, Paul Ploog ("Supervisor Ploog"), informed Norgren via email that he was required to complete four additional trainings that surpassed the basic workplace harassment training already administered to all employees, which Norgren had completed.

13. One of the four trainings was labeled as HR 670.1 and titled "How to be Anti-Racist" ("CRT Training"). This training focused on "cultural competence" and how to be "antiracist," specifically centering on the teachings of Ibram X. Kendi and including a mandatory full minute of silence for the murder of George Floyd.

14. The training included the instruction that Norgren was to stop using the phrase "I am not a racist" or "I can't be a racist" as a defense or denial. Norgren was also told to admit the definition of racist as someone who supports racist policies or expresses racist ideas, confess to the racist policies and ideas we support, and accept that the United States of America is the root of such racist ideas.

15. In addition, as part of the training, DHS Assistant Commissioner Karen McKinney told employees that their application of these principles was mandatory by stating, "we need all of you to do this." Norgren understood this to mean that he was required as DHS policy to admit the truth of the training's definition of racism, confess to racist policies and

ideas he supports, and accept that the United States of America is the root of such racist ideas.

16. Another of the four trainings, labeled as HR 670.2 and titled "Understanding Gender Identity and Expression: Moving Beyond the Binary," sought to "educate" employees on gender identity and expression and the experiences of transgender and non-binary employees. The training also instructed employees to refrain from telling others that their gender identity is wrong.

17. It was clarified later that only two of the course trainings, HR 670.1 and 670.2, were mandatory. Norgren generally opposed both HR 670.1 and 670.2 trainings.

18. Norgren opposed the CRT Training for several reasons:

   a. CRT rejects core concepts of Western Liberalism, including meritocracy and colorblindness and instead proposes that invisible systems of power – "systemic racism" – bear the primary responsibility for racial inequality. Peggy McIntosh, *White People Facing Race: Uncovering Myths that Keep Racism in Place* (2009).

   b. CRT deems any person in a minoritized racial group as a victim of a rigged system and that those born into "privileged races" are automatically and inherently exploiters of minorities. Robin DiAngelo, *White Fragility* (2018).

   c. Critical Race theorists explicitly reject the principle of equality under the law, arguing that legal equality, nondiscrimination, and "colorblindness" are mere camouflages used to uphold white supremacist structures. Delgado & Stefanic, *Critical Race Theory: An Introduction* (1995).

4880-6522-6254, v. 2

    d. Importantly, encompassed in this notion is the idea that the First Amendment serves to advance the interests of white supremacy, thus the government should restrict freedom of speech that is deemed "racist" or "hateful." Ibram X. Kendi, *Inequality: Pass an Anti-Racist Constitutional Amendment*, Politico (accessed January 6, 2022) https://www.politico.com/interactives/2019/how-to-fix-politics-in-america/inequality/pass-an-anti-racist-constitutional-amendment/.

    e. Finally, CRT also warns people of color against "internalized whiteness," the theory that people of a nondominant group believe the "myths" and "misinformation" about people of color because "whiteness" is deemed superior. National Museum of African American History & Culture, *Talking about Race: Whiteness* (accessed June 18, 2021) https://nmaahc.si.edu/learn/talking-about-race/topics/whiteness.

19. CRT rejects the traditional view of equality under Title VII and imparts that Norgren's refusal to subscribe to CRT as a person of color is merely "internalized whiteness."

20. While Norgren generally opposed the CRT Training, he specifically voiced his objection to the gender identity training on September 10, 2020, to Supervisor Ploog.

21. Norgren believes that God created only two sexes and two genders, male and female. Thus, the concepts of nonbinary gender and the belief that one can choose their gender or sex is contrary to his sincerely held religious belief.

4880-6522-6254, v. 2

22.  Norgren never treated any DHS employee or patient differently at the Security Hospital because of his personal, sincerely held religious beliefs.

23.  Norgren additionally sought an exemption from Supervisor Ploog, who told him to contact both Carol Olson and Scott Melby to voice his objections. Norgren was then told by both Olson and Melby to contact Denise Considine in Human Resources to address his concerns. He did.

24.  However, the issue was then directed to Director of Equal Opportunity and Access Division Zecharias Hailu ("Hailu"), who informed Norgren that his request for a religious exemption was denied.

25.  Thus, despite seeking relief from multiple levels of DHS personnel, Norgren was still required to complete the training.

26.  This was not the first time Norgren had been discriminated and retaliated against for his religious beliefs.

27.  On October 12, 2018, Norgren was working an overtime night shift at the Security Hospital and saw the night-shift supervisor, Luke Pherson, while doing his rounds. Pherson had been talking with another employee about politics, specifically, on the topics of *Roe v. Wade*, the U.S. Constitution, and gender identity.

28.  On the topic of gender identity, Pherson asked Norgren how many genders existed. Norgren felt he had to respond as Pherson was his supervisor and Norgren was on shift. Norgren responded that he believed only two genders and two sexes existed, based on everything he read and researched on DNA and biology. However, Pherson grew angry and told Norgren that "his God" made them that way, despite Norgren not mentioning his

religious beliefs at that point in the conversation. As the two continued to discuss and disagree on this topic, Pherson told Norgren he could be fired for the way he thought and spoke.

29. From there on, Norgren noticed a difference in how both he, and his son Aaron Norgren, were treated as employees at the Security Hospital. After this exchange, Norgren also avoided his supervisors for fear of termination for his beliefs and advocacy of equality and Title VII compliance. This, of course, only grew worse when Norgren was mandated to take trainings contrary to his beliefs, as directed by multiple DHS supervisors.

30. Finally, this was aggravated by Jodi Harpstead's direction and communication that included the urging of a "focus on training" to change "minds for life."

31. Norgren endured months of reviewing weekly communications and videos sent by DHS that contradicted the principles of equality under the Constitution and Title VII. Despite this threatened fear of termination, Norgren voiced his dissent against such indoctrination of contradictory views and theories to DHS supervisors.

32. However, by November 2, 2020, Norgren emailed Hailu stating:

> Your decision [to refuse exemption from the training] solidified and confirmed my contemplating of not continuing my 27 year service with the State of Minnesota. This year has created a hostile and uncomfortable work environment with the implementation and propagation of "Critical [Race] Theory" as evidenced by the State of Minnesota and SHA trainings and emails from Commissioner Harpstead and the Strategic Anti-Racism Team (start). As well as the weekly videos send out by DHS on info link. It is unfortunate that I feel forced to prematurely separate from the State of Minnesota service.

Attached hereto as **Exhibit A** is a true and correct copy of this correspondence.

33. Through both the threat of being terminated for his religious beliefs, as well as the mandated training and refusal for exemption, Norgren was constructively discharged on January 6, 2021. This constructive discharge was due to the discriminatory, hostile, and demeaning workplace environment created by DHS and Commissioner Jodi Harpstead.

34. Prior to January 6, 2021, Norgren had never received any formal complaints relating to his performance or ability to do his job.

35. Norgren had also intended to retire after thirty (30) years of employment in order to receive a higher pension.

36. If Norgren had not been subject to a discriminatory, hostile, and demeaning work environment by the actions of DHS and Commissioner Jodi Harpstead, he would not have retired for another three years and would have received a larger pension.

37. On June 26, 2021, Norgren brought a charge of discrimination to the Equal Employment Opportunity Commission.

38. DHS responded to Norgren's claims of discrimination and retaliation by claiming he was not constructively discharged, as he was soon planning to retire.

39. However, DHS failed to rebut Norgren's November 2, 2020, correspondence where he states that the conditions at DHS had become so unworkable that he had *no choice but* to retire.

40. On January 3, 2022, Norgren was given Notice of Right to Sue by the EEOC. Attached hereto as **Exhibit B** is a true and correct copy of the EEOC's Notice.

4880-6522-6254, v. 2

**CAUSES OF ACTION**

**COUNT I – TITLE VII RACIAL DISCRIMINATION AGAINST DHS**

41. Plaintiff restates and realleges the foregoing as if fully stated herein.

42. As an employee of Native American descent, Plaintiff is a member of a protected class.

43. Plaintiff was qualified for his role at the Security Hospital as he had worked there without any disciplinary issues for twenty-seven (27) years and was rehired by the Security Hospital following his stint at the FBI.

44. Plaintiff was constructively discharged from his position when he was forced to retire early due to the hostile workplace environment resulting from his opposition to the infiltration and forced imposition of CRT ideology.

45. Plaintiff's constructive discharge occurred under circumstances giving rise to an inference of discrimination as Plaintiff was told he was required to take the additional trainings that conflicted with his advocacy of compliance under Title VII and equality under the United States Constitution. Plaintiff additionally continued to oppose the infiltration and forced imposition of CRT ideology.

46. Similarly situated employees, who were not members of a protected class, were treated differently as they were not constructively discharged from the hostile environment created by DHS that was directed specifically towards Plaintiff.

47. This hostile environment was created by DHS discriminating against Plaintiff, as a person of color, for his refusal to subscribe to CRT and "internalized whiteness" for possessing such beliefs.

48. Because Plaintiff is a member of a protected class, who was qualified for his position, suffered an adverse employment action occurring under circumstances that give rise to an inference of discrimination, and was treated differently than other employees who were not members of a protected class, he has been discriminated against on the basis of race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.

49. Plaintiff has suffered damages in the form of humiliation, embarrassment, degradation of character, constructive discharge, and the loss of a higher pension for such violation.

## COUNT II – RELIGIOUS DISCRIMINATION UNDER TITLE VII AGAINST DHS

50. Plaintiff restates and realleges the foregoing as if fully stated herein.

51. As a Christian, Plaintiff is a member of a protected class.

52. Plaintiff held bona fide religious beliefs that conflicted with the mandated training and other views imposed on him by Defendant DHS.

53. Plaintiff informed Defendant DHS that his beliefs conflicted with the mandated training. Despite this, Defendant DHS mandated Plaintiff take the training that conflicted with his beliefs.

54. Plaintiff, as a Christian, was also threatened that he could be terminated for his specific beliefs.

55. Plaintiff was constructively discharged from his position when he was forced to retire early due to the hostile workplace environment resulting from the threat that he could be terminated for his religious beliefs and refusal to subscribe to conflicting ideologies.

56. Plaintiff's constructive discharge occurred under circumstances giving rise to an inference of discrimination:

   a. Plaintiff was told that his sincerely held religious beliefs on gender ideology could warrant termination.

   b. Defendant's enforcement of an ideology that directly conflicted with Plaintiff's Christianity created a hostile environment.

57. Because Plaintiff is a member of a protected class, who was qualified for his position, and suffered an adverse employment action occurring under circumstances that gives rise to an inference of discrimination, distinct from other similarly situated employees due to his specific religious beliefs, he has been discriminated against on the basis of religion, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.

58. Plaintiff has suffered damages in the form of humiliation, embarrassment, degradation of character, constructive discharge, and the loss of a higher pension for such violation.

### COUNT III – RETALIATION UNDER TITLE VII AGAINST DHS

59. Plaintiff restates and realleges the foregoing as if fully stated herein.

60. On numerous occasions, Plaintiff voiced his dissent to the discriminatory actions and behavior of Defendant. These discriminatory actions included the mandate of additional training, the disparate treatment for those who sought exemptions from such training, and the threat of termination for religious beliefs.

61. Defendant retaliated against Plaintiff for opposing such discrimination by making the working environment at the Security Hospital so hostile and unbearable that Plaintiff

was constructively discharged, despite the fact that he was not planning to retire for three more years, in order to receive a larger pension.

62. Because Plaintiff voiced his dissent against Defendant's discriminatory actions, and Defendant retaliated against Plaintiff for such dissent by constructively discharging Plaintiff, Defendant has retaliated against Plaintiff under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3.

### COUNT IV – 42 U.S.C. § 1983 DEPRIVATION OF RIGHTS AGAINST DEFENDANT JODI HARSPTEAD, COMISSIONER OF DHS
### (First Amendment Retaliation and Compelled Speech)

63. Plaintiff restates and realleges the foregoing as if fully stated herein.

64. Plaintiff engaged in a constitutionally protected activity when he requested an exemption from the mandatory training on the basis of his sincerely held religious beliefs and race.

65. Plaintiff also engaged in a constitutionally protected activity by expressing his freedom of speech when his supervisor demanded he answer a personal question regarding his politics and sincerely held religious beliefs.

66. Despite that Supervisor Luke Pherson, as an agent of Defendant Harpstead, threatened that Plaintiff could be terminated for such protected speech, this protected speech in no way impeded Plaintiff's performance of his daily duties as a Security Counselor, nor did it interfere with the regular operations of the Security Hospital, as Plaintiff never received any formal complaint regarding his performance.

67. Plaintiff finally engaged in a constitutionally protected activity through his advocacy for Title VII compliance and equality under the United States Constitution, which is a matter of public concern.

68. Defendant Harpstead acted under color of the law when she constructively discharged Plaintiff, a Native American and a Christian, for his advocacy for equality, Title VII compliance, and for his sincerely held religious beliefs. Defendant Harpstead accordingly willfully deprived Plaintiff of his right to freedom of speech and his freedom of religion.

69. Plaintiff's protected activity was a substantial and motivating factor in Defendant Harpstead's actions as evidenced by Luke Pherson's, Defendant Harpstead's agent, threat that Plaintiff could be terminated for his political and sincerely held religious beliefs. Moreover, Plaintiff was constructively discharged after requesting an exemption from the gender identity training based on his sincerely held religious beliefs.

70. Plaintiff's constructive discharge was an official act of DHS policy because both the required training and infiltration of CRT was promulgated by multiple DHS supervisors, under the direction of Defendant Harpstead through several emails, including one where she urged a focus on "the training and brave conversations we need to have to change…minds for life."

71. Plaintiff's requested exemption was also denied by Hailu, in accordance with DHS policy, as directed by Defendant Harpstead.

4880-6522-6254, v. 2

72. Defendant further demanded that Plaintiff apply the "anti-racist" trainings in HR 670.1 by admitting to, confessing, or refraining from using certain language related to beliefs about racism and the United States as the root of a racist system and culture.

73. Defendant Harpstead directed trainings and sent correspondence in her official capacity as Commissioner of the Department of Human Services.

74. Plaintiff but felt he had no chose but to comply as a condition of his employment.

75. Defendant Harpstead's demand that Plaintiff speak in a manner that violated his sincerely held religious beliefs and conscience caused Plaintiff's constructive discharge.

76. Because Plaintiff engaged in a constitutionally protected activity, and Defendant Harsptead acted under color of law through an act of official DHS policy when she constructively discharged Plaintiff, Defendant Harpstead retaliated against Plaintiff, in violation of the First Amendment and 42 U.S.C. § 1983.

77. Plaintiff has suffered damages in the form of humiliation, embarrassment, degradation of character, and the loss of a higher pension for such violation.

**COUNT V – RACIAL DISCRIMINATION UNDER THE MINNESOTA HUMAN RIGHTS ACT AGAINST DHS**

78. Plaintiff restates and realleges the foregoing as if fully stated herein.

79. Plaintiff, as a Native American, is a member of a protected class under the Minnesota Human Rights Act.

80. Plaintiff was qualified for his role as Security Counselor. This is demonstrated through his holding this position for twenty-seven (27) years without issue and being rehired to that position after a three-year stint at the FBI.

81. Plaintiff was constructively discharged from his position as Security Counselor, resulting in the loss of a higher pension for such violation.

82. Plaintiff's constructive discharge occurred under circumstances giving rise to an inference of discrimination as Defendant's agent threated Plaintiff with termination for his beliefs, and because Plaintiff was constructively discharged after seeking an exemption from the CRT Training and gender identity training based on his race and beliefs on race.

83. Moreover, Defendant discriminated against Plaintiff when he refused to subscribe to the ideology expected of him as a person of color and was instead constructively discharged for his "internalized whiteness."

84. Because Plaintiff is a member of a protected class, who was qualified for his position, suffered an adverse employment action that occurred under circumstances giving rise to an inference of discrimination, Defendant discriminated against Plaintiff on the basis of race in violation of the Minnesota Human Rights Act under Minn. Stat. § 363A.15(1).

85. Plaintiff has suffered damages in the form of humiliation, embarrassment, degradation of character, constructive discharge, and the loss of higher pension for such violation.

**COUNT VI – REPRISAL UNDER THE MINNESOTA HUMAN RIGHTS ACT AGAINST DHS**

86. Plaintiff restates and realleges the foregoing as if fully stated herein.

87. Plaintiff was discriminated against under the Minnesota Human Rights Act as a member of a protected class, who suffered an adverse employment action that occurred under circumstances giving rise to an inference of discrimination.

88. Defendant, as the perpetrator of discrimination, intentionally engaged in reprisal against Plaintiff by constructively discharging him for opposing discrimination in violation of the Minnesota Human Rights Act under Minn. Stat. § 363A.15(1).

89. Plaintiff has suffered damages in the form of humiliation, embarrassment, degradation of character, constructive discharge, and the loss of a higher pension for such violation.

**WHEREFORE**, Plaintiff Joseph Norgren prays for Judgment as follows:

A. For an Award of damages in an amount in excess of $75,000.00, exclusive of interest and costs, the exact amount to be proven at trial;

B. For costs and disbursements and expenses;

C. For reasonable attorney's fees, pursuant to 42 U.S.C. § 1988, 42 U.S.C § 2000e–5(k), and Minn. Stat. § 363A.33, or other applicable law; and

D. For such other relief as the Court deems just and equitable.

|  |  |
|---|---|
|  | ECKLAND & BLANDO LLP |
| Dated: April 20, 2022 | /s/ DANIEL J. CRAGG<br>Daniel J. Cragg (#389888)<br>Anne St. Amant (#401923)<br>800 Lumber Exchange Building<br>10 South Fifth Street<br>Minneapolis, Minnesota 55402<br>dcragg@ecklandblando.com<br>astamant@ecklandblando.com<br>(612) 236-0160<br><br>UPPER MIDWEST LAW CENTER<br>Douglas P. Seaton (#127759)<br>James V. F. Dickey (#393613)<br>8421 Wayzata Boulevard, Suite 300<br>Golden Valley, Minnesota 55426<br>(612) 428-7000<br>Doug.Seaton@umlc.org<br>James.Dickey@umlc.org<br><br>*Counsel for Plaintiff* |