UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Joseph Norgren,<br><br>    Plaintiff,<br><br> v.<br><br>Minnesota Department of Human Services and Commissioner Jodi Harpstead, in her individual capacity,<br><br>    Defendants. | Court File No. 22-cv-489 (ADM/HIB) |

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION TO DISMISS**

---

## INTRODUCTION

Defendants Department of Human Services' and Commissioner Jodi Harpstead's (collectively "Defendants") formulaic motion to dismiss is devoid of any substantive analysis arguing for dismissal and ignores the Eighth Circuit's longstanding and well-established pleading standards by demanding Plaintiff Joseph Norgren ("Norgren") plead his *entire case* in his complaint. This pseudo-summary judgment demand, of course, falters as Defendants ironically allege that Norgren's Complaint includes conclusory legal statements when in fact their opposition is merely a formulaic recitation of the elements of each claim and a shallow analysis of the facts supposedly missing from Norgren's Amended Complaint. Through his Amended Complaint, Norgren adequately alleges claims of Title VII race and religious discrimination and retaliation against DHS, and a

1

Section 1983 claim against Commissioner Harpstead for First Amendment retaliation and compelled speech.[1] For these reasons, Norgren respectfully requests this Court deny Defendants' motion to dismiss.

## FACTUAL BACKGROUND

Joseph Norgren is a devout Christian and is fifty percent Native American. (Norgren Amended Compl. ¶ 7.) Growing up, he recalls being subjects to racial slurs and other discriminatory behavior as a result of his Native American heritage. (*Id*. ¶ 8.) Norgren has been a dedicated security counselor with the Minnesota Security Hospital ("Security Hospital") for twenty-seven years. (*Id*. ¶¶ 9-10.) Norgren's son, Aaron, also works as a security counselor at the Security Hospital. (*Id*. ¶ 11.) During Norgren's tenure with the Security Hospital, he was an exemplary employee who had never received any formal complaints. (*Id*. ¶ 34.) Because of this, shortly before his constructive termination, Norgren did not intend to retire for another three years so he could receive a larger pension at the thirty-year mark. (*Id*. ¶ 36.)

### *The Mandated Trainings*

However, Norgren's plans changed as the Department of Human Services ("DHS") progressively began to promulgate ideology that directly contradicted principles of equality under Title VII. (See (*Id*. ¶¶ 13-19.) This came to a culmination when Norgren's supervisor, Paul Ploog ("Supervisor Ploog"), informed Norgren via email he was required to complete

---

[1]     Norgren respectfully requests his state law claims of violations of the Minnesota Human Rights Act (Counts V and VI) be dismissed without prejudice for lack of subject matter jurisdiction to be refiled in state court.

four additional trainings, despite the fact that he had completed all basic workplace harassment training already administered to all employees. (*Id*. ¶ 12.) Of these four trainings, one was labeled as HR 670.1 and was titled "How to be Anti-Racist" ("CRT Training") This training focused on "cultural competence" and how to be "antiracist." (*Id.* ¶ 13.)

This CRT Training focused on the teachings of Ibram X. Kendi and included a full, mandatory minute of silence for the murder of George Floyd. (*Id*.) The training instructed Norgren to stop using the phrases, "I am not a racist" and "I can't be a racist" as a defense or denial. (*Id*. ¶ 14.) Norgren was also told to admit the definition of racist as someone who supports racist policies or expresses racist ideas, to confess to the racist policies and ideas Americans support and accept that the United States of America is the root of such racist ideas. (*Id*.) DHS Assistant Commissioner Karen McKinny emphasized the importance of the embodiment and application of such principles by emphasizing, "we need all of you to do this." (*Id.* ¶ 15.) This strong emphasis in supporting such assertions led Norgren to believe that he did in fact have to confess to his own racism, racist policies, and support the notion that the United States of America is the root of such racist ideas. (*Id*.)

Another one of the four trainings, labeled as HR 670.2 titled "Understanding Gender Identity and Expression: Moving Beyond the Binary," sought to "educate" employees on gender identity. (*Id.* ¶ 16.) Although it was presented as "education," the training instructed employees that a person choosing their own gender identity is not wrong. (*Id.*)

### *CRT Ideology*

CRT rejects core concepts of western liberalism, including meritocracy and colorblindness and instead proposes that invisible systems of power—"systematic racism"—bar the primary responsibility for racial inequality. (*Id*. ¶ 18(a).) CRT deems any person in a minoritized racial group as a victim of a rigged system and that those born into "privileged races" are automatically and inherently exploiters of minorities. (*Id*. ¶ 18(b).) Critical race theorists, like Ibram X. Kendi and his teachings, explicitly reject the principle of equality under the law, arguing that legal equality, nondiscrimination, and "colorblindness" are mere camouflages used to uphold white supremacist structures. (*Id*. ¶ 18(c).) Important to the notion of the mandatory training and infiltration, encompassed in critical race theory, is the notion that the government should restrict freedom of speech that is subjectively deemed "racist" or "hateful." (*Id*. ¶ 18(d).) Finally, CRT warns people of color against "internalized whiteness," specifically that people of color are led to believe "whiteness" is superior. (*Id*. ¶ 18(e).)

### *Norgren's Opposition to the infiltration of ideologies conflicting with Title VII*

Norgren generally opposed the CRT training and spoke out against the infiltration of CRT ideology as he endured months of reviewing weekly communications and videos sent by DHS that contradicted the principles of equality under the Constitution and Title VII. (*Id*. ¶ 31.) While he spoke out, despite a fear of termination, he noticed how both he and his son were treated differently—with hostility and animosity. (*See id*. ¶ 29.) DHS supervisors' behavior was discriminatory through this demeaning and hostile treatment that both Norgren and his son endured. (*Id*. ¶¶29, 33.)

4

This treatment was also attributed to Norgren's vocal opposition to the gender identity training. (*Id*. ¶ 20.) Because Norgren believes that God creates only two sexes and two genders, male and female, the concepts of nonbinary gender and the belief that one can choose their gender or sex is contrary to his sincerely held religious belief. (*Id*. ¶ 21.) Despite this belief, Norgren never treated any DHS employee or patient differently. (*Id*. ¶ 22.) Norgren nevertheless sought an exemption from his Supervisor Ploog, who merely referred him to other DHS supervisors, who in turn referred him to contact someone else in DHS leadership to address his concerns. (*Id*. ¶ 23.) He did. (*Id*.) He once again was referred to *another* DHS supervisor, the Director or Equal Opportunity and Access Division, Zecharuas Hailu. ("Supervisor Hailu"). (*Id*. ¶ 24.) Despite this futile goose chase, Norgren was still required to complete the training. (*Id*. ¶ 25.)

This was notable as it came after jarring comments made by Norgren's supervisor on the night shift in October of 2018. (*Id*. ¶ 27.) The on-shift supervisor, Luke Pherson ("Supervisor Pherson"), had been talking with another employee about politics, including *Roe v. Wade*, the U.S. Constitution, and gender identity." (*Id*. ¶ 27.) Supervisor Pherson directly asked Norgren how many genders existed. (*Id*. ¶ 28.) Supervisor Pherson was Norgren's supervisor and he was on shift, so Norgren felt like he had no choice but to answer. (*Id*.) Norgren stated that only two genders and two sexes existed, based on his research in DNA and biology. (*Id*.)

Despite having answered the question, and despite being his supervisor, Supervisor Pherson grew angry and told Norgren that "his God made them" that way, despite the fact that Norgren had not even brought up his religious beliefs at this point in the conversation.

5

(*Id.*) Supervisor Pherson then told Norgren he could be fired for the way he thought and spoke. (*Id.*)

### *Norgren is constructively discharged*

Similar to Norgren's opposition to the infiltration of CRT ideology, Norgren noticed how he and his son were treated as employees at the Security Hospital. (*Id.* ¶ 29.) The mandatory trainings and continued forcing of conflicting ideologies aggravated this treatment. (*Id.* ¶¶ 29, 31.) This was further emphasized and aggravated by Commissioner Jodi Harpstead ("Commissioner Harpstead"), who directed and communicated this ideology and urged the need to "focus on training" to change "minds for life." (*Id.* ¶ 30.)

On November 2, 2020, Norgren could no longer take the discriminatory, hostile, and demeaning environment no longer, and wrote to Supervisor Hailu:

> Your decision [to refuse exemption from the training] solidified and confirmed my contemplating of not continuing my 27 year service with the State of Minnesota. This year has created a hostile and uncomfortable work environment with the implementation and propagation of "Critical [Race] Theory" as evidenced by the State of Minnesota and SHA trainings and emails from Commissioner Harpstead and the Strategic Anti-Racism Team (start). As well as the weekly videos send out by DHS on info link. It is unfortunate that I feel forced to prematurely separate from the State of Minnesota service.

(*Id.* ¶ 32.) Despite that Norgren had intended to retire after thirty years of employment to receive a higher pension, he could no longer be subjected to the hostile environment created by the actions of DHS and Commissioner Harpstead. (*Id.* ¶¶ 35-36.)

### **LEGAL STANDARD**

A complaint states a claim for relief when it includes (1) a short and plain statement of the grounds for the court's jurisdiction, (2) a short and plain statement of the claim that

6

the pleader is entitled to relief; and (3) demand for the relief sought. Fed. R. Civ. P. 8. Under Rule 12 of the Federal Rules of Civil Procedure, a complaint will not be dismissed when it contains sufficient factual matter, which accepted as true, states a claim to relief that is plausible on its face. *Ashcroft v. Iqbal,* 556 U.S. 662, (2009) (*citing Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, (2007)). While a party must show that success on the merits is more than a "sheer possibility," it is not a "probability requirement." *Id*. A complaint states a plausible claim for relief if its "factual content ... allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. This standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556. The Court's determination of whether a plaintiff has met this standard is "context-specific" and requires it to "draw on its judicial experience and common sense." *Zink v. Lombardi*, 783 F.3d 1089, 1098 (8th Cir. 2015) (en banc) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## ARGUMENT

Norgren's Amended Complaint contains sufficient factual matter that, on its face, is plausible to state claims of Title VII race and religious discrimination, Title VII retaliation, and First Amendment retaliation and compelled speech under 42 U.S.C. § 1983. The Supreme Court has repeatedly emphasized that "the precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512 (2002) (quoting *Furnco Const. Corp. v. Waters,* 438 U.S. 567, 577, (1978)). A plaintiff

alleging discrimination need not plead specific facts supporting a prima facie case to survive a motion to dismiss. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002). All a plaintiff must do is "give[ ] [the defendant] fair notice of the basis for [his or her] claims." *Id*. To otherwise measure a case against a particular formation of the prima facie case at the pleading stage is inappropriate. *Id*.

Norgren's Amended Complaint provides fair notice and plausibility of facts that adequately state the aforementioned claims for relief. The facts alleged are more than mere formulaic recitations of the law and instead detail his beliefs, the discrimination he faced for his beliefs and the protected activity he engaged in as a person of color and a person with sincerely held religious beliefs, and his constructive discharge due to such discrimination.

## I.    NORGREN ADEQUATELY PLEADS A CLAIM FOR TITLE VII RACE DISCRIMINATION.

Norgren has adequately pled a claim for Title VII race discrimination because his Amended Complaint demonstrated that (1) that he is a member of a protected class; (2) who was meeting the legitimate expectations of his employer; (3) who suffered an adverse employment action; and (4) similarly situated employees who were not members of the protected class were treated differently. *See Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000).

Defendants formulaically argue that Plaintiff "does not plead any facts showing the fourth element – that similarly situated employees outside Plaintiff's protected class were treated differently." (Defendants' Memorandum in Support of its Motion to Dismiss,

hereinafter "Defendants' Brief" at 9.) But Defendants not only place a summary judgment-like burden on Norgren to state his entire case at the pleading stage, they also ignore the facts alleged in his Amended Complaint which do in fact support his claim for Title VII race discrimination. Defendants finally ignore the crucial relationship between the third and fourth elements of a Title VII race discrimination claim, which demonstrates that despite the fact that thirty-one employees were mandated to take the CRT Training, it was *Norgren* who constructively discharged for the conditions he faced which compelled him to resign.

"To demonstrate that that [a plaintiff] is similarly situated, [the plaintiff] need only establish that he or she was treated differently than other employees whose violations were of comparable seriousness." *Burton v. Arkansas Sec'y of State*, 737 F.3d 1219, 1231 (8th Cir. 2013) (quotations omitted). "The individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Evance v. Trumann Health Services, LLC*, 719 F.3d 673, 678 (8th Cir. 2013) (quoting *Bone v. G4S Youth Services, LLC*, 686 F.3d 948 (8th Cir. 2012). What is "comparable" is a question decided on a case-by-case basis; the "similarly situated co-worker inquiry is a search for a substantially similar employee, not for a clone." *Chaney v. Plainfield Healthcare Ctr.,* 612 F.3d 908, 916 (7th Cir. 2010). Relevant comparable factors include employees with (1) the same job description, (2) subject to the same standards, (3) had the same supervisor, and (4) had comparable experience, education, and other qualifications. *E.E.OC. v. Kohler Co.,* 335 F.3d 766, 775-76 (8th Cir. 2003). And while courts consider this a "rigorous" standard,

such standard is often analyzed and applied in the context of summary judgment. *See, e.g.*
*Muor v. U.S. Bank Nat. Ass'n*, 716 F.3d 1072, 1078 (8th Cir. 2013); *Lee v. K Mart Corp.,*
836 F. Supp. 841, 845 (D. Minn. 2011); *Lewis v. City of Union City, Georgia*, 918 F.3d 12
13, 1218 (11th Cir. 2019);  *Coleman v. Donahoe*, 667 F.3d 835, 849 (7th Cir. 2012).

Contrary to Defendants' assertion, while other employees similarly situated in job
description were mandated to take the training, it was *Norgren* who was constructively
discharged by the hostile environment created by his dissent. (Norgren Amended Compl.
¶ 46.) Defendants cite to the "thirty-one other employees in Plaintiff's work unit, reporting
to the same supervisor, [who] were also required to take the same computer-based
training[.]" (Defendants' Brief at 9.) But Defendants fail to take into account that, as
Norgren alleges in his Amended Complaint, it is not merely the mandated training that
resulted in Norgren's discrimination and constructive discharge. After Norgren was
required to take the training, he also continued speaking out against such training and the
infiltration of Critical Race ideology in the workplace; he alleges, as a result of his protests,
that both he and his son were treated differently, specifically with hostility. (Norgren
Amended Complaint ¶¶ 29, 33.)

Moreover, Defendants ignore and contradict Norgren's Amended Complaint when
asserting "the facts as pleading indicate that Plaintiff's 'opposition' to the training was
internalized. It was not communicated to DHS management until his "farewell" email to
EOAD on November 2, 2020." (Defendants' Brief at 10.) This willful misreading of
Norgren's Amended Complaint strains credulity. Norgren specifically alleges in Paragraph
31 that he *did* in fact frequently voice his dissent to the infiltration of CRT ideology at

DHS. Apparently, frequent voicing of dissent does not, in Defendants' minds, equate to expression of opposition. One wonders what they would have Norgren do to meet their improper burden. Unfortunately, they fail to establish any standard for communication (beyond the common sense one used by humanity for centuries, including by Norgren), in their motion to dismiss.

Contrary to Defendants' assertion, Norgren's Amended Complaint alleges that he continued to voice his dissent to DHS supervisors against the "weekly communications and videos sent by DHS that contradicted the principles of equality under the Constitution and Title VII." (*Id*. ¶ 31.) Defendants ignore such facts alleged in Norgren's Complaint and that he adequately alleges that this continued dissent created a discriminatory, hostile, and demeaning workplace, which was fostered by DHS supervisors and Commissioner Harpstead. (*Id*. ¶ 33.) This discriminatory and hostile workplace environment drove him to retire, despite the fact that as alleged, he had not planned to do so for several more years in order to receive a larger pension. (*Id*. ¶ 35.)

Defendants wish to ignore these facts alleged by Norgren by formulaically claiming he failed to state a claim and attempting to proffer contradictory evidence that in fact creates a factual dispute, and one that should not be remedied through a motion to dismiss. *See, e.g. Mainstream Fashions Franchising, Inc. v. All These Things, LLC*, 453 F. Supp. 3d 1167, 1189 (D. Minn. 2020). But Norgren has alleged the basis for his Title VII claim: that he was constructively discharged due to the hostility and animosity resulting from his voiced opposition to DHS supervisors, as a person of color, to the infiltration of CRT ideology.

## II.     NORGREN ADEQUATELY PLEADS A CLAIM FOR TITLE VII RELIGIOUS DISCRIMINATION.

Contrary to Defendants' legally deficient argument, Norgren has stated a Title VII Religious Discrimination claim. When bringing a Title VII claim for religious discrimination, a plaintiff must show either direct evidence of a Title VII violation or an inference of discrimination or retaliation under the *McDonnell Douglas* burden-shifting framework. *See Fiero v. CSG Sys., Inc.,* 759 F.3d 874, 878 (8th Cir. 2014). Disparate treatment claims under Title VII based on indirect evidence ordinarily are analyzed under the *McDonnell Douglas* burden-shifting framework. *Doucette v. Morrison Cty.*, 763 F.3d 978, 982 (8th Cir. 2014). Under *McDonnell Douglas*, Norgren must show that: (1) he is a member of a protected group; (2) he is qualified for his former position; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). Because these are fact-sensitive elements, this test is examined more rigorously at the summary judgment phase, not necessarily in the pleading stages. *See, e.g. Torgerson v. City of Rochester*, 643 F.3d 1031, 1044 (8th Cir. 2011).

a. Norgren meets the plausibility requirements of a Title VII religious discrimination claim.

Defendants once again formulaically assert, with no analysis, that Norgren does not sufficiently plead a Title VII claim for religious discrimination because he does not "allege that similarly situated employees outside Plaintiff's protected class were treated differently." (Defendants' Brief at 15.) But the facts of Norgren's Amended Complaint more than adequately allege that DHS discriminated "distinct[ly] from other similarly

situated employees due to his specific religious beliefs[.]" (Norgren Amended Complaint ¶ 57.) Incredibly, Defendants boldly assert that Norgren does not even plead facts giving rise to an *inference* of discrimination. The absurdity of Defendants' assertion can be easily rebuffed by a simple reading of Norgren's Amended Complaint.

The relevant facts, as alleged in Norgren's Amended Complaint for his Title VII religious discrimination, are as follows: (1) Norgren is a Christian and thus a member of a protected class (Norgren Amended Compl. ¶ 7.), (2) he had been an employee with DHS for twenty-seven years without issue and was thus qualified for his role and met his employer's legitimate employment expectations, (*Id*. ¶ 10.), (3) he was constructively discharged after the hostility created by the refusal for exemption from ideological indoctrination and the subsequent voicing of his beliefs, (*Id*. ¶¶ 29-32.), and (4) the circumstances of which give rise to an inference of discrimination as Norgren was told by a DHS supervisor that he could be fired for his beliefs. (*Id*. ¶ 28.) Norgren was then subsequently refused an exemption from training based on an ideology that would have forced him to contradict his beliefs. (*Id*. ¶ 24.) Following these occurrences, Norgren was demeaned and treated with hostility by DHS supervisors. (*Id*. ¶ 29.) This hostile environment directly led to his constructive discharge. (*Id*. ¶¶ 31-33.)

As established earlier, these allegations are more than sufficient to survive at the pleading stage, as the *McDonnell Douglas* test is an *evidentiary* test, not a Rule 12 weapon to be wielded against a complaint. *See Swierkiewicz*, 534 U.S. at 510 (describing the *McDonnell Douglas* framework as "an evidentiary standard, not a pleading requirement."). Indeed, the Supreme Court confirmed that it "has *never* indicated that the

requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Id.* at 511 (emphasis added). The Eighth Circuit Court of Appeals has followed the Supreme Court's clear lead, making clear that the "elements of the prima facie case are [not] irrelevant to a plausibility determination in a discrimination suit." *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016) (quotation omitted), the elements are "part of the background against which a plausibility determination should be made," and "may be used as a prism to shed light upon the plausibility of the claim." *Id.* (quotations omitted).

Upon this proper understanding of the pleading standard, the circumstances surrounding Norgren's constructive discharge as alleged demonstrate the plausibility of his claim; the allegations do not need to prove his *entire* claim at this stage of litigation. *Blomker*, 831 F.3d at 1056. In fact, courts recognize that discrimination, by its very essence, is hard to prove using a rigid or formulistic criteria. *See, e.g.*, *Swierkiewicz*, 534 U.S. at 512. But as amply demonstrated above, the facts Norgren alleges meet the pleading standards for Title VII religious discrimination under *Swiekiewecz* and *Twombly*.[2]

b. Norgren adequately pleads that similarly situated employees were treated differently.

Finally, other similarly situated employees were not constructively discharged due to the hostile and unbearable work environment created by Defendants' religious

---

[2]    The Supreme Court makes clear in *Bell Atlantic Corp. v. Twombly* that its analysis does not run counter to *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 (2002), which held that "a complaint in an employment discrimination lawsuit need not contain specific facts establishing a prima facie case of discrimination" but rather enough facts to state a claim for relief that is plausible on its face. 550 U.S. 544 (2007).

discrimination. As stated above, "[t]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Evance v. Trumann Health Services, LLC*, 719 F.3d 673, 678 (8th Cir. 2013). What is "comparable" is a question decided on a case-by-case basis; the "similarly situated co-worker inquiry is a search for a substantially similar employee, not for a clone." *Chaney v. Plainfield Healthcare Ctr.,* 612 F.3d 908, 916 (7th Cir. 2010). Relevant comparable factors include employees with (1) the same job description, (2) subject to the same standards, (3) had the same supervisor, and (4) had comparable experience, education, and other qualifications. *E.E.OC. v. Kohler Co.*, 335 F.3d 766, 775-76 (8th Cir. 2003). And while courts consider this a "rigorous" standard, this is often analyzed through the context of summary judgment. *See, e.g. Muor v. U.S. Bank Nat. Ass'n*, 716 F.3d 1072, 1078 (8th Cir. 2013); *Lee v. K Mart Corp.,* 836 F. Supp. 841, 845 (D. Minn. 2011); *Lewis v. City of Union City, Georgia*, 918 F.3d 12 13, 1218 (11th Cir. 2019); *Coleman v. Donahoe*, 667 F.3d 835, 849 (7th Cir. 2012).

While other employees, who were similarly situated in job description were mandated to take the training, it was *Norgren* who was threatened termination for his specific beliefs, who specifically requested an exemption from the training contradicting his beliefs, and who was denied such exemption. (Norgren Amended Complaint ¶ 28.) It was *Norgren* who was subsequently treated differently—with hostility, anger, and a will to change his beliefs—for refusing to submit to an ideology conflicting with his sincerely held religious beliefs. (*Id*. ¶¶ 29-31.) Finally, it was *Norgren* was constructively discharged by the hostile environment created by his dissent. (*Id*. ¶ 32.) While employees may be

compared based on similar positions or experience, Norgren voiced his opposition based on his own specific beliefs, making "violations" of "comparable seriousness" inapplicable. Thus, the relevant analysis turns on whether employees in similar positions or with similar job experience were constructively discharged—as Norgren alleges in his Amended Complaint; they were not. (*Id*. ¶ 46.)

Norgren has met this basic plausibility standard for showing that similarly situated employees, that is, the other employees mandated to take the training and working in similar positions, were not subject to the same demanding and hostile behavior resulting in a constructive discharge.

## III.    NORGREN ALLEGES FACTS SUFFICIENT TO DEMONSTRATE HE WAS CONSTRUCTIVELY DISCHARGED.

Norgren's constructive discharge is a central aspect of his discrimination claim and is adequately supported by the facts he alleges in his Amended Complaint, especially his email correspondence where he cites to the "hostile and uncomfortable work environment" created by the "implementation and propagation of" conflicting ideologies and mandated training. (Norgren Amended Complaint ¶ 32.) Defendants attempt to rebut this by impermissibly introducing "contradictory" evidence into their motion to dismiss, in violation of the standard for motion to dismiss under the Federal Rules of Civil Procedure. But all this does is demonstrate the factual disputes ripe for discovery, disputes that should not and cannot be decided on a motion to dismiss. *Ashcroft v. Iqbal,* 556 U.S. 662, (2009) (*citing Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, (2007)); *Hedge v. Lyng*, 689

F. Supp. 877 (D. Minn. 1987) (finding that numerous factual questions make dismissal inappropriate).

A constructive discharge occurs when an employee resigns after the employer has created an intolerable working environment in a deliberate attempt to compel such a resignation." *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 928 (8th Cir. 2004). A constructive discharge arises when a reasonable person would find the conditions of employment intolerable. *Hukkanen v. International Union,* 3 F.3d 281, 285 (8th Cir. 1993). Constructive discharge, like actual discharge, is a materially adverse employment action. *See, e.g.*, *Fitzgerald v. Henderson,* 251 F.3d 345, 357–58 (2d Cir.2001). But to demonstrate constructive discharge, the plaintiff must show that he was forced to resign because her working conditions, from the standpoint of the reasonable employee, had become unbearable. *See, e.g.*, *Lindale v. Tokheim Corp.,* 145 F.3d 953, 955 (7th Cir.1998).

Evidence of the employer's intent can be proven "through direct evidence or through evidence that the employer could have reasonably foreseen that the employee would quit as a result of its actions." *Fercello v. Cnty. of Ramsey,* 612 F.3d 1069, 1083 (8th Cir. 2010). The employer can render working conditions intolerable through inaction as well as action. *Henderson v. Simmons Foods, Inc.,* 217 F.3d 612, 617 (8th Cir.2000). The materially adverse employment action element may be met by a series of acts by the employer that, considered collectively, amount to constructive discharge. *See Helton v. Southland Racing Corp.,* 600 F.3d 954, 961 (8th Cir. 2010). It should be noted that the three cases above, which form the standard for constructive discharge in the Eighth Circuit, are applying such standard *not* at the pleading stage, but at the summary judgment stage or

after trial—where the factual record had been much further developed. Thus, applying such standards at the pleading stage allows for much more basic allegations of facts supporting such constructive discharge.

In the analogous Title VII discrimination context, courts have determined that whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22-23 (1993). These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id*. at 23.

As apparent based on the relevant cases and standards cited above, the constructive discharge analysis is highly fact sensitive, requiring a detailed factual inquiry which is inappropriate at this state of the proceedings.

A. <u>Norgren was constructively discharged based on the hostile environment created by his opposition to the infiltration CRT ideology.</u>

In his Amended Complaint, Norgren alleges that he "endured months of reviewing weekly communications and videos sent by DHS that contradicted the principles of equality under the Constitution and Title VII . . . Norgren voiced his dissent against such indoctrination of contradictory views and theories to DHS supervisors." (Norgren Amended Complaint ¶ 31.) He then alleges that on November 2, 2020, he told DHS Supervisor Hailu that "[t]his year has created a hostile and uncomfortable work

environment with the implementation and propagation of "Critical [Race] Theory[.]"[3] (*Id.* ¶ 32.) But Defendants either ignore or willfully forget the procedural posture of this case. They assert that the facts alleged are insufficient—an assertion entirely inappropriate at this stage and, even if it were not, fails in the face of the Amended Complaint itself. Defendants call for Norgren to plead his entire case and claim every single fact associated with his claims; they claim that anything short of such is a failure warranting dismissal. This is not the standard.

Norgren specifically alleges that he endured constant infiltration of ideologies in direct contradiction with Title VII principles of equality, the constant opposition to such principles, and the negative treatment resulting from such opposition inflicted upon both him and his son. (*Id.* ¶¶ 29-31.) Norgren even includes correspondence stating that this infiltration formed the basis for his early retirement. (*Id.* ¶ 32.) Norgren's pleading goes beyond a mere recitation of the legal elements by including correspondence which clearly reflects, or even in the most basic inference makes plausible, that the environment created by DHS led him to retire early, pushing him out, and thus constructively discharging him.

Defendants attempt to rebut this adequate pleading by first willfully ignoring its effect and the plausibility it creates, as well as by presenting a singular email response that purports to rebut the facts alleged in Norgren's Amended Complaint. First, in *E.E.O.C. v.*

---

[3] Hostile work environment and constructive discharge claims may be distinct causes of action under Title VII. The claims have different elements, and, while a hostile work environment can form the basis for a constructive discharge allegation, hostile work environment discrimination can exist absent a tangible employment action. *Winspear v. Cmty. Dev., Inc.,* 574 F.3d 604, 607 (8th Cir.2009) (quotation and internal citations omitted).

*Univ. of Chicago Hosps.,* the defendant attempted to argue similarly when it tried to assert that although it had packed up the employee's office, resulting in the employee's alleged constructive discharge, such employee had already prepared a resignation letter, making its own actions irrelevant. 276 F.3d 326, 332 (7th Cir. 2002). The court notes that "although [the employee] had *prepared* her letter of resignation before arriving at work that day, her decision to *submit* that letter could have surely been based on seeing her belongings packed up and her office being used for storage—a sight that signaled to [the employee] that her superiors were set to do what they had intimated and attempted to do earlier." *Id.* at 332-33. Similarly, while Defendants may attempt to argue that Norgren had already been planning to retire, this assertion presents a factual dispute as to whether Norgren's decision to retire was ultimately based off the actions of DHS supervisors.

Moreover, Defendants introduction of contrary evidence creates a factual dispute that is inappropriate at the dismissal stage because it creates a litany of factual questions that only evidence produced through discovery can enlighten and clarify. Factual disputes are not suitable for a resolution on a motion to dismiss. *See, e.g. Mainstream Fashions Franchising, Inc. v. All These Things, LLC*, 453 F. Supp. 3d 1167, 1189 (D. Minn. 2020). Importantly, Defendants blatantly ignore the standard under the Federal Rules of Civil Procedure, which state that the facts alleged in Norgren's Amended Complaint must be construed as true.

Adhering to the proper standard under Fed. R. Civ. P. 12(b)(6) and construing all the facts alleged in his Amended Complaint as true, Norgren's claim for relief is plausible

on its face and could lead a court to the reasonable inference that Defendants are liable for Norgren's early retirement, which ultimately served as a constructive discharge.

    B. <u>Norgren was constructively discharged based on the hostile environment created by his request for exemption and sincerely held religious beliefs.</u>

Norgren sufficiently pleads constructive discharge for the hostile environment created by his opposition to the infiltration of gender ideology at DHS. Norgren alleges the following: he is a Christian. (Norgren Amended Compl. ¶ 7.) His specific religious beliefs instruct that God created only two sexes and two genders. (*Id*. ¶ 21.) Thus, the concepts of nonbinary gender and the belief that one can choose their gender or sex contradicts Norgren's sincerely held religious belief.[4] (*Id*. ¶ 21.) Despite this belief, he never treated any employee differently. (*Id*. ¶ 22.) Yet it was *Norgren* who was threatened with termination for his set of beliefs. (*Id*. ¶ 28.) It was *Norgren* who was treated differently after his request to be exempted from such training was denied, despite his treatment of every patient and employee the same and despite no complaints ever being lodged against him, especially for mistreatment of a nonbinary person. (*See generally* Norgren's Amended Compl., *see also* ¶ 23.) In *E.E.O.C. v. University of Chicago Hospitals*, the court found that the EEOC had made its case by demonstrating that several circumstances indicated a religiously discriminatory intent, including the employee being called a "religious fanatic" and superiors had stated problems with her "religious beliefs and bringing religion into the workplace." 276 F.3d at 333.

---

[4]    The question of whether a religious belief is "sincerely held' is factual in nature. *See Murphy v. Missouri Dept. of Corrections*, 372 F.3d 979, 983 (8th Cir. 2004).

This different treatment and threat of termination, paired with the refusal for exemption and the constant infiltration of an ideology that forced Norgren to actively contradict his sincerely held religious beliefs, that created an environment where he was left no choice but to leave. This unequivocally amounted to a constructive discharge. *See Helton v. Southland Racing Corp.,* 600 F.3d 954, 961 (8th Cir. 2010) (the materially adverse employment action element may be met by a series of acts by the employer that, considered collectively, amount to constructive discharge).

Had Norgren not been constructively discharged, he not only would have been forced to subscribe to an ideology deeply conflicting with his religion, but he would have also been forced to continue to endure hostile treatment from his supervisors for such beliefs. Norgren adequately makes this showing in his Amended Complaint through the factual allegations pled and restated above. Using the proper Fed. R. Civ. P 12(b)(6) standard, a reasonable person would determine that Norgren had no choice at all but to leave DHS, given these circumstances surrounding his beliefs and the treatment endured for such beliefs. Thus, a court could reasonably conclude that Norgren's early retirement amounted to a constructive discharge based on such alleged facts.

## IV. NORGREN ADEQUATELY PLEADS A CLAIM FOR RETALIATION UNDER TITLE VII.

Norgren sufficiently pleads facts to establish that Defendants retaliated against him for his voiced opposition to the infiltration of ideologies conflicting with Title VII—and that his constructive discharge was the result of such retaliation. To establish a prima facie case of retaliation, the plaintiff must present evidence that (1) he engaged in a protected

activity; (2) an adverse employment action was taken against him; and (3) a causal connection exists between the two. *Barker v. Missouri Dep't of Corr.*, 513 F.3d 831, 835 (8th Cir. 2008); *Thompson v. Bi–State Dev. Agency*, 463 F.3d 821, 826 (8th Cir. 2006). Contrary to DHS's argument, Norgren's Amended Complaint alleges on its face that DHS retaliated against Norgren due to his opposition of its discriminatory conduct. Norgren was compelled to resign and sacrifice a larger pension based on the retaliation he faced for his vocal opposition. This is an adequate showing of the "dissuasion" a reasonable employee would face by the threat, the mandatory trainings, and infiltration of ideologies conflicting with Title VII, and continued opposition of such infiltration despite such threat and hostility. To pretend that such conditions would neither be discriminatory nor retaliatory is simply to ignore the reality of having to work in and tolerate such kind of an environment. Because a causal connection exists between Norgren's protected activity and the adverse employment action taken against him, Norgren has stated a claim for retaliation under Title VII.

A. Norgren's opposition to Defendants' discriminatory behavior is a protected activity under Title VII.

In his Amended Complaint, Norgren alleges that he voiced his dissent to Defendants' discriminatory actions and behavior on numerous occasions. "Protected activity" includes opposition to employment practices prohibited under Title VII. *Buettner v. Arch Coal Sales Co.,* 216 F.3d 707, 714 (8th Cir. 2000). However, a plaintiff employee need not establish that the conduct he opposed was in fact prohibited under Title VII. *Id.* Rather he need only demonstrate that he had a "good faith,

reasonable belief that the underlying challenged conduct violated [Title VII]." *Id.* Norgren opposed DHS's conduct, specifically, the mandate of training that directly conflicted with the principles of Title VII, the disparate treatment for those who sought exemptions, and his continuous opposition for related communications and infiltration of such ideology in the workplace. (Norgren Amended Compl. ¶ 60.) This opposition is a protected activity under Title VII because Norgren's opposition to the infiltration of CRT ideology was in conformance with the principles of equality under Title VII, which specifically prohibits employment discrimination on the basis of race. As alleged, the hostile environment was created by DHS's discrimination against Norgren for his refusal to subscribe to CRT as a person of color, and for his so-called "internalized whiteness" for possession such beliefs. (*Id.* ¶ 47.) Thus, Norgren's opposition to Defendants' race-based discrimination is a protected activity under Title VII.

Norgren also voiced his opposition to Defendants' discriminatory behavior relating to his sincerely held religious beliefs. After being threatened with termination and voicing his dissent to the gender-identity training, Norgren was subject to animosity, all while continuing to oppose such violations while under the threat that he could be terminated. (*See* Amended Norgren Compl. ¶¶ 27-29.) This dissent is a protected activity under Title VII because Norgren's opposition to the infiltration of gender ideology, which sought to compel a body of thinking in direct contradiction to his sincerely held religious beliefs, was in conformance with the principles of equality under Title VII, which specifically prohibits employment discrimination on the basis of religion.

B. <u>Norgren adequately alleges that he faced material adverse action for his protected</u>
   <u>activity.</u>

An adverse employment action is a tangible change in working conditions that
produces a material employment disadvantage, which can include termination, cuts in pay
or benefits, and changes that affect an employee's future career prospects, as well as
circumstances amounting to a constructive discharge. *Wilkie v. Dep't of Health and Human
Servs.,* 638 F.3d 944, 955 (8th Cir. 2011). "The materially adverse action prong is
objective, requiring [a court] to consider whether a reasonable employee in the plaintiff's
position might have been dissuaded from making a discrimination claim because of the
employer's retaliatory actions." *Weger v. City of Ladue*, 500 F.3d 710, 726 (8th Cir.
2007) (internal quotation marks omitted); *see also Jackson v. United Parcel Serv.,
Inc.,* 548 F.3d 1137, 1141–42 (8th Cir. 2008) (holding that to establish an adverse
employment action, each plaintiff must show a "material employment disadvantage"
(internal quotation marks omitted)).

Norgren properly alleged that he experienced a "tangible change in working
conditions that produce[d] a material employment disadvantage" when DHS retaliated
against him by constructively discharging him. (Norgren Amended Compl. ¶ 61.) This
material disadvantage, of course, included a lower pension as Norgren was not planning to
retire for another three years in order to obtain a larger pension. (*Id*.) Norgren has
objectively and sufficiently pled that he faced a material employment disadvantage through
his constructive discharge by foregoing of a larger pension due to DHS's retaliation, all of
which is demonstrated in email correspondence sent to Supervisor Hailu on November 2,

2020. (*Id*. ¶ 32.) After Norgren began to voice his dissent to DHS's discriminatory actions, he was treated with hostility. (*Id*. ¶ 29.) His opposition launched a vicious cycle wherein DHS continued its persistent infiltration of ideologies conflicting with Title VII, to which Norgren would voice his dissent, and the hostile and demeaning treatment he faced by DHS supervisors grew worse. (*Id*.)

This treatment would have dissuaded a reasonable worker from making or supporting a charge of discrimination, which was supported by the facts alleged that Norgren's continuous opposition made the workplace a more difficult environment to work in every day, ultimately evidenced by his constructive discharge. DHS's retaliation made it ultimately impossible for Norgren to continue his employment with DHS, despite the fact that he had been a model employee for twenty-seven years. (Norgren Amended Comp. ¶ 34.) DHS wholly ignores the reality of such circumstances when brazenly stating that Norgren alleges no facts demonstrating a constructive discharge or adverse action. (Defendants' Brief at 22.) Such obtuse refusal to recognize Norgren's allegations is emblematic of the retaliation Norgren endured for months at the hands of Defendants.

Finally, Defendant not only wholly ignores the facts alleged in Norgren's Amended Complaint, but once again improperly and impermissibly cites to its own vague and incomplete evidence to demonstrate that such protected activity was not the but-for cause of his constructive termination. (*Id*.) This argument not only falters on the procedural posture of a motion to dismiss, as DHS must argue that the facts as alleged in Norgren's Amended Complaint are insufficient to create a claim for retaliation, but DHS also creates a factual dispute through the submission of this email correspondence. *See, e.g.*

*Mainstream Fashions Franchising, Inc. v. All These Things, LLC*, 453 F. Supp. 3d 1167,

1189 (D. Minn. 2020) (factual disputes are not suitable for resolution on a motion to

dismiss).

Because Norgren has pled that he engaged in protected activity and that a causal

connection exists between such protected activity and his constructive termination, he has

sufficiently stated a claim for retaliation under Title VII.

### V.   NORGREN ADEQUATELY PLEADS THAT DEFENDNNT COMISSIONER JODI HARPSTEAD DEPRIVED HIM OF HIS CONSTITUTIONAL RIGHTS UNNDER 42 U.S.C. § 1983.

In his Complaint, Norgren pleads the elements of his claims of First Amendment

retaliation and compelled speech against Commissioner Harpstead and alleges facts which

support that Commissioner Harpstead promulgated DHS policies that compelled speech

and retaliation under the First Amendment for the refusal to submit to such conflicting

ideologies. At the pleading stages of a discrimination case, a court's primary analysis

revolves around whether the facts as alleged plausibly state a claim and whether that claim

asserts a violation of a clearly established right. *Kaden v. Slykhuis,* 651 F.3d 966, 969 (8th

Cir. 2011) ("At this extremely early stage of the litigation, there is a reasonable inference

that [the prison]'s policy was unconstitutionally applied to the censored publication."

(citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when

the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."))). The relevant inquiry is thus

whether, taken in the light most favorable to the party asserting the injury, the facts alleged

27

show that the state employee violated a constitutional right. *Siegert v. Gilley,* 500 U.S. 226, 232 (1991).

    A.  <u>Commissioner Harpstead acted under color of the law by using her role as DHS Commissioner to violate Norgren's constitutional rights.</u>

A government official acts under color of law when "a sufficient nexus exists between the official's public position and the official's harmful conduct." *Ramirez-Peyro v. Holder*, 574 F.3d 893, 900 (8th Cir. 2009). This is a "fact intensive" inquiry. *Id.* at 901. "Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." (quoting *West v. Atkins,* 487 U.S. 42,50 (1988)). "The element is satisfied if the defendant acts or purports to act in the performance of official duties, even if [she] oversteps his authority and misuses power." *Johnson v. Phillips,* 664 F.3d 232, 240 (8th Cir.2011). A court looks to the "nature and circumstances of the [state employee's] conduct and the relationship of that conduct to the performance of [his or her] official duties." *Roe v. Humke,* 128 F.3d 1213,1216 (8th Cir. 1997) (quotation omitted).

The facts of Norgren's Complaint sufficiently demonstrate the nexus between Commissioner Harpstead's official position and her conduct. As Norgren alleges, the infiltration of ideologies conflicting with the principles of the constitution occurred under the direction of Harpstead. (Norgren Amended Compl. ¶¶ 33, 36.) Her constant correspondence advocating for the changing of "minds for life" influenced and advanced a policy where dissenting perspectives were not tolerated. (*Id.* ¶ 65.) It should be readily apparent that Commissioner Harpstead's role and duties as commissioner of DHS do not

entail changing minds for life. And thankfully so. It is instead her role to ensure that as a governmental institution, DHS employees treat the citizens they serve with equality under the law and the Minnesota and United States Constitutions. Unlike his superiors, Norgren carried out this mission. Unlike his superiors, he never received any complaint or discipline for failing to do so in his twenty-seven years with DHS. (*Id*. ¶ 34.)

      B.  <u>Norgren adequately alleges First Amendment Retaliation.</u>

"To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, the plaintiff must show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Revels v. Vincenz,* 382 F.3d 870, 876 (8th Cir. 2004) (citing *Naucke v. City of Park Hills,* 284 F.3d 923, 927–28 (8th Cir. 2002)). Under the third prong, a plaintiff must show that the retaliatory motive was a "substantial factor" or "but-for cause" of the adverse action. *Baribeau v. City of Minneapolis,* 596 F.3d 465, 481 (8th Cir. 2010). In other words, the plaintiff must show he was "singled out because of [his] exercise of constitutional rights." *Id.* (quotation omitted); *see also Hartman v. Moore*, 547 U.S. 250, 256 (2006)("[W]hen nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, we have held that retaliation is subject to recovery as the but-for cause of official action offending the Constitution.").

      The Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Rather, the First Amendment protects a public employee's right, in certain

circumstances, to speak as a citizen addressing matters of public concern. See, *e.g., Pickering v. Bd. Of Ed. Of Tp. High School Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 568 (1968); *Connick v. Myers*, 461 U.S. 138, 147 (1983); *Rankin v. McPherson,* 483 U.S. 378, 384 (1987); *United States v. Nat'l Treasury Emps. Union,* 513 U.S. 454, 466 (1995).

"The typical *Pickering-Connick* case involves a government employee causing workplace disruption by speaking as a citizen on a matter of public concern, followed by government action adversely affecting the employee's job." *Thompson v. Shock*, 852 F.3d 786, 791 (8th Cir. 2017)*.* This "test provides flexible weighing of the case-specific facts to balance the interests of the government with those of the employee." *Id.*

The *Pickering* analysis includes two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. First, the court must determine whether the employee spoke as a citizen on a matter of public concern. *Pickering*, 391 U.S. at 568. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. *See Connick*, 461 U.S. at 147. If the answer is yes, then the possibility of a First Amendment claim arises.

Second, the court must determine whether the employee's speech has undermined the effective function of the public employer's enterprise. *Richardson v. Sugg*, 448 F. 3d 1046, 1062 (8th Cir. 2006) (citing *Rankin v. McPherson,* 483 U.S. 378, 388 (1987)).

 While government employers have a considerable amount of discretion to manage their operation, including the assurance that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission, the First

30

Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens. See *Perry v. Sindermann,* 408 U.S. 593, 597 (1972). So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are <u>necessary for their employers to operate efficiently and effectively</u>. *See*, *e.g., Connick*, 461 U.S. at 147. ("Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government") (emphasis added). The court in *Garcetti v. Ceballos* found that "many citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public employees like "any member of the general public" in holding that all speech within the office is automatically exposed to restriction. 547 U.S. 410, 420-421 (2006) (citing *Pickering,* 391 U.S. at 573.))

     i.    <u>Critical Race and gender ideology are matters of public concern.</u>

First, in satisfaction of the first element of the *Pickering* test, both topics at issue here—critical race and gender ideology—are matters of public concern. To determine whether speech involves a matter of public concern, a court looks to the "content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48. When speech relates "to any matter of political, social, or other concern to the community," it addresses a matter of public concern. *Id*. at 146. In a recent Sixth Circuit opinion, which considered a motion to dismiss and applied the *Pickering* analysis, the court delved into the history and issue of gender identity as a matter of public concern, stating, that gender ideology, particularly the use of pronouns, convey a powerful message

31

implicating "a sensitive topic of public concern." *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021). The Sixth Circuit references several works analyzing the issue of gender ideology to demonstrate the relevance such conversation and topic holds in society. (*Id*. at 508-09.) As a highly debated political and social issue, the *Meriwether* court concluded that gender ideology is a matter of public concern. *Id*. at 609. The *Meriwether* court's sound reasoning is no less applicable to Norgren's allegations regarding gender identity "training.". His thoughts, words, and beliefs on such topics directly addressed a matter of public concern. *Id.*

Critical Race ideology can and should be analyzed similarly, through the history of its development as an ideology that is now frequently referenced in the political sphere, discussed through the several literary works and articles, and even examined in museums. (*See* Norgren Amended Compl. ¶ 18.) Thus, as both a highly debated and discussed political and social topic, critical race ideology is also a matter of public concern.

ii.   <u>The facts alleged in Norgren's Amended Complaint demonstrate that his speech did not conflict with the DHS's operations.</u>

Because both critical race and gender ideology are matters of public concern, the second prong of analysis is whether the employee's asserted protected speech interferes with the operations of the government enterprise. The facts of Norgren's complaint do not demonstrate any interference. In fact, the facts alleged demonstrate the opposite: Norgren was a dedicated employee at DHS for twenty-seven years. (Norgren Amended Compl. ¶ 10.) Norgren completed all his basic workplace harassment trainings. (*Id*. ¶ 12.) Norgren had never treated any DHS patient or employee different due to his personal beliefs. (*Id*. ¶

32

22.) Finally, nowhere in Norgren's Amended Complaint does he allege that DHS operations were impacted by his opposition to the infiltration of such ideologies. (*See generally* Norgren Amended Complaint.) Moreover, the infiltration of the ideologies conflicting with the principles of the U.S. Constitution and Title VII do not support the smooth and ordered operations DHS. Rather, as Norgren alleges in his Amended Complaint, he was able to perform his job duties sufficiently for twenty-seven years without any complaints, and especially without any additional training that imposed obligations in conformance of CRT and gender ideology. (*Id.* ¶ 34.) In fact, it was not until the infiltration of such ideologies that the environment at DHS grew hostile and toxic. (*Id.* ¶ 32.) Thus, Norgren's speech did not impact daily operations and the functioning of DHS, and this speech is accordingly protected.

   iii.   Norgren adequately alleges that adverse action was taken against him for his protected speech.

       Finally, Norgren adequately alleges adverse action was taken against him, which was motivated by the asserted protected activity above. An "adverse employment action" is exhibited by a material employment disadvantage that is causally connected to his participation in a protected activity; this adverse employment action can include a change in salary, benefits, or responsibilities. *Meyers v. Starke*, 420 F.3d 738 (8th Cir. 2005). A constructive discharge can also be considered an adverse employment action. *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 497 (8th Cir. 1995). As described at length above, Norgren adequately alleges he suffered an adverse employment action in the form of a constructive discharge. (Norgren Amended Comp. ¶ 32.) This was done through

Commissioner Harpstead's direction, as an official act of DHS policy, as both the required training and infiltration of CRT and gender ideology was promulgated by multiple DHS supervisors, under the direction of Commissioner Harpstead as demonstrated through email correspondence and the direction of such policy. (*Id*. ¶¶ 69-70.) Accordingly, Norgren adequately alleges he suffered an adverse employment action based on his protected activity, and thus states a claim against Commissioner Harpstead for First Amendment Retaliation. Accordingly, Norgren has adequately pled both claims of compelled speech and First Amendment Retaliation against Commissioner Harpstead under 42 U.S.C. § 1983.

C.  Norgren adequately pleads a claim for compelled speech.

Finally, Norgren has adequately pled a claim for compelled speech against Commissioner Harpstead under 42 U.S.C. § 1983. To make out a valid compelled-speech claim, a party must establish (1) speech; (2) to which he objects; that is (3) compelled by some governmental action. *Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015). The First Amendment prohibits compelled speech in which the government requires an individual personally to express a message he disagrees with. *Gralike v. Cook*, 191 F.3d 911, 917 (8th Cir. 1999). When "the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Wooley v. Maynard*, 430 U.S. 705, 717 (1977).

Defendants admit that Norgren satisfied the first two elements of compelled speech. However, Defendants claim that "no allegation that commissioner Harpstead (or anyone at

DHS for that matter) ever *compelled* Plaintiff to make those statements." (Defendant's Brief at 31.) But Defendants misstate the law of compelled speech when brazenly asserting that no compelled speech itself occurred. The First Amendment's safeguard against state action "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley,* 430 U.S. at 714. Thus, the Supreme Court, starting with *Barnette,* has consistently "prohibit[ed] the government from telling people what they must say." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,* 547 U.S. 47, 61 (2006). The idea of compelled speech goes far beyond mere utterance of words, but through the forced accommodation of a message as well; the First Amendment's protections extend "beyond written or spoken words as mediums of expression[.]" *Hurley,* 515 U.S. at 569. While "pure speech" activities are rigorously protected regardless of meaning, symbolic speech or conduct is protected when it is "sufficiently imbued with elements of communication," *Spence v. State of Wash.*, 418 U.S. 405, 951-52 (1974).

Commissioner Harpstead compelled speech through both the mandatory trainings which demanded Norgren to confess to or refrain from using certain language regarding race in America (Norgren Amended Compl. ¶ 72.), refrain from telling people their gender identity is wrong (*Id*. ¶ 73.), and constant correspondence urging employees to stand behind such ideologies through "the training and brave conversations we need to have to change…minds for life[.]" (*Id*. ¶ 70.) This direction of policy and the mandated language expressed in the trainings essentially instructed Norgren on what he could and could not say and believe, surpassing beyond the duties of his job to which he performed without issue, or instruction of the like, for twenty-seven years. (*Id*. ¶ 10.) Norgren was told to

speak, or refrain from speaking, even when such speech contradicted his own beliefs and thus subjected him to being "a courier" for Defendants' ideologies.

Accordingly, Norgren adequately pleads that Defendants violated his constitutional rights by compelling speech and retaliating against him for the protected activities.

## VI.   NORGREN'S STATE LAW CLAIMS SHOULD BE DISMISSED WITHOUT PREJUDICE FOR LACK OF SUBJECT MATTER JURISDICTION.

Plaintiff readily admits that no jurisdiction exists under the Eleventh Amendment for his Minnesota Human Rights Act claims. Moreover, Plaintiff does not intend to make an argument for supplemental jurisdiction. Instead, Plaintiff requests this Court dismiss without prejudice Count V – Racial Discrimination Under the Minnesota Human Rights Act Against DHS and Count VI – Reprisal Under the Minnesota Human Rights Act Against DHS.

The doctrine of sovereign immunity precludes litigation against the state unless the state has consented to suit. *Nieting v. Blondell,* 306 235 N.W.2d 597, 599 (Minn. 1975). The doctrine of sovereign immunity derives from the Eleventh Amendment and prohibits an individual from suing a state, regardless of the relief sought, unless the state consents to suit or Congress abrogates state immunity. *See* U.S. Const. amend. XI; *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 54–56 (1996); *Klingler v. Dep't of Revenue,* 455 F.3d 888, 893 (8th Cir.2006) (citing *Hans v. Louisiana,* 134 U.S. 1, 15, 10 (1890)). The Eleventh Amendment also bars state-law claims against an unconsenting state in federal court. *Cooper v. St. Cloud State Univ.,* 226 F.3d 964, 968 (8th Cir.2000). A federal court must dismiss an action barred by the Eleventh Amendment for lack of subject-

matter jurisdiction. *See Seminole Tribe,* 517 U.S. at 64–65. Thus, because the State does not waive its sovereign immunity, this Court lacks subject matter jurisdiction.

As stated in Defendants' Meet and Confer Statement, the parties were unable to agree upon the stipulated language for a voluntary dismissal. Norgren believes that such claims should be dismissed for a lack of subject matter jurisdiction, with any order of such dismissal making clear that the period of limitations of Norgren's state claims are tolled, allowing him to reassert such claims in state court.

There would have otherwise been a claim splitting issue where Norgren's claims could have been precluded under res judicata. As the Eighth Circuit states, res judicata bars a plaintiff from bringing in a second action claims that "were raised or could have been raised in the prior suit" or whether the claims arise out of the "same nucleus of operative facts as the prior claim." *Lane v. Peterson,* 899 F.2d 737, 741, 742 (8th Cir.1990). The District of Minnesota uses an instructive example of a plaintiff who first brought claims under Title VII and then, later, brought a new lawsuit asserting the employer's conduct violated the Labor Management Relations Act; the Eighth Circuit found the second case precluded under res judicata. *Banks v. Int'l Union Elec., Elec., Tech., Salaried & Mach. Workers,* 390 F.3d 1049, 1052–53 (8th Cir.2004); *see also Brzostowski v. Laidlaw Waste Sys., Inc.,* 49 F.3d 337, 338 (7th Cir.1995) (finding that employee's state-court breach-of-employment-contract action precluded a subsequent Age Discrimination in Employment action in federal court). But the principles of res judicata do not apply here because the court lacks subject matter jurisdiction for the very reason that the State has refused to waive sovereign immunity.

Thus, to avoid issues with res judicata, Norgren had to bring his state law claims in federal district court. Importantly, a dismissal without prejudice for lack of subject matter jurisdiction would toll any applicable statute of limitations for Norgren's claims. When the parties met and conferred, Plaintiff proposed language similar to *Lopez-Buric v. Notch*, No. CIV.00–CV–928 ADM/RL, 2001 WL 1488112 (D. Minn. April 25, 2001) ("the case was originally filed in federal court, the remaining claims are not remanded, but instead are dismissed without prejudice. Under 28 U.S.C. § 1367(d), the period of limitations of Plaintiff's state claims has been tolled, allowing her to reassert the state claims in state court.")

Accordingly, Plaintiff requests his state claw claims (Count V and VI) be dismissed without prejudice so the statute of limitations may be tolled to reassert such claims in state court.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests this Court deny Defendants' motion to dismiss Plaintiff's claims of Title VII race discrimination, Title VII religious discrimination, Title VII retaliation, and his 42 U.S.C. § 1983 claim of First Amendment retaliation and compelled speech. Plaintiff also respectfully requests this Court dismiss *without* prejudice his state law claims of racial discrimination and reprisal under the Minnesota Human Rights Act for lack of subject matter jurisdiction, in order to refile such claims in state court and toll the statute of limitations.

ECKLAND & BLANDO LLP

Dated: June 1, 2022                    /S/ DANIEL J. CRAGG
                                       Daniel J. Cragg (#389888)
                                       Anne St. Amant (#401923)
                                       800 Lumber Exchange Building
                                       10 South Fifth Street
                                       Minneapolis, Minnesota 55402
                                       dcragg@ecklandblando.com
                                       astamant@ecklandblando.com
                                       (612) 236-0160

                                       UPPER MIDWEST LAW CENTER
                                       Douglas P. Seaton (#127759)
                                       James V. F. Dickey (#393613)
                                       8421 Wayzata Boulevard, Suite 300
                                       Golden Valley, Minnesota 55426
                                       (612) 428-7000
                                       Doug.Seaton@umlc.org
                                       James.Dickey@umlc.org

                                       *Counsel for Plaintiff*