UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| Joseph Norgren, | Court File No. 22-CV-00489 (ADM/TNL) |
| Plaintiff, | |
| vs. | **DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS** |
| Minnesota Department of Human Services, and Commissioner Jodi Harpstead, in her individual capacity, | |
| Defendants. | |

### INTRODUCTION

In his Opposition Memorandum, Plaintiff Joseph Norgren insists that his threadbare Amended Complaint, filled with labels and formulaic recitation of the elements of his claims, is sufficient to avoid dismissal. Plaintiff misconstrues the *Twombly* motion-to-dismiss standard, which requires that a plaintiff plead "factual content that allows the court to draw the inference that the defendant is liable for the misconduct alleged." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (dismissing complaint where plaintiffs did not "nudge[ ] their claims across the line from conceivable to plausible"). Instead, Plaintiff would have the Court apply a notice pleading standard under pre-*Twombly/Iqbal* case law. (Pl.'s Opp'n, ECF 29 at 8.)

Fatal to both the Title VII discrimination and retaliation claims, Plaintiff has not pleaded any facts which would allow the Court to draw the inference that he suffered an adverse employment action. Instead, Plaintiff merely labels his retirement as a constructive

discharge due to a hostile work environment. Nor does the Amended Complaint contain any factual allegations that would plausibly demonstrate that the Minnesota Department of Human Services ("DHS") treated similarly situated employees outside of Plaintiff's protected class any differently. Additionally, with respect to the retaliation claim, Plaintiff fails to plead facts plausibly showing that he engaged in protected activity by opposing a practice that Title VII forbids.

Finally, with respect to his First Amendment claims, Plaintiff has failed to plead any personal conduct on the part of Commissioner Harpstead and chooses to ignore black-letter law on qualified immunity. Significantly, Plaintiff is unable to point to any controlling authority on similar facts providing notice to the Commissioner that her conduct was constitutionally prohibited. Thus, no further analysis on the applicability of qualified immunity is necessary, and dismissal is required.

Accordingly, the Court should dismiss the Amended Complaint for failure to state a claim upon which relief can be granted.[1]

---

[1] Plaintiff concedes that DHS has Eleventh Amendment sovereign immunity for his claims under the Minnesota Human Rights Act ("MHRA"). (Pl.'s Opp'n, ECF 29 at 36.) Accordingly, the MHRA claims should be dismissed without prejudice. Because this Court lacks jurisdiction over those claims, it would be inappropriate for the Court to issue any substantive rulings concerning the statute of limitations or on any tolling issues. *See Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 548 (2002) (holding that section 1367(d) does not toll the limitations period "for state law claims asserted against nonconsenting state defendants that are dismissed on Eleventh Amendment grounds").

## ARGUMENT

**I.     PLAINTIFF FAILS TO PLEAD A PLAUSIBLE RACIAL DISCRIMINATION CLAIM.**

Plaintiff's Opposition introduces his race discrimination claim by noting that DHS' anti-racism training "included a full, mandatory minute of silence for the murder of George Floyd." (Pl.'s Opp'n, ECF 29 at 3.) It is difficult to surmise how asking employees during the training to observe a moment of silence for Mr. Floyd in any way plausibly states a race discrimination claim.

In both his Amended Complaint and Opposition Memorandum, Plaintiff espouses his disagreement with certain principles that he identifies as "critical race theory." (Am. Compl. ¶¶18-19; Pl.'s Opp'n, ECF 29 at 3-4.) Whether Plaintiff agrees with certain principles that he views as propounded by Peggy McIntosh, Robin DiAngelo, Delgado & Stefanic, and Ibram X. Kendi is without legal import. Rather, the issue here is whether Plaintiff has pleaded sufficient facts to state a plausible race discrimination claim. *See Twombly*, 550 U.S. at 547, 556 (holding that a complaint must contain "enough facts to state a claim to relief that is plausible on its face"); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Here, Plaintiff fails to sufficiently plead the third and fourth elements of a race discrimination claim – whether Plaintiff suffered an adverse employment action; and whether he was treated differently than similarly situated employees outside the protected class. (*See* Defs.' opening memo., ECF 22 at 9-13.) Regarding the fourth element, the Amended Complaint fails to sufficiently plead that Plaintiff was treated

3

differently than similarly situated employees because Plaintiff's 31 co-workers reporting to the same supervisor were also required to complete DHS' anti-racism training.[2]

In his Opposition, however, Plaintiff insists he was treated differently than his co-workers[3] because he objected to the anti-racism training. To support this assertion, Plaintiff relies on the vague allegations in paragraph 31 that he "voiced his dissent" to DHS' "indoctrination of contradictory views." (Pl.'s Opp'n, ECF 29 at 11.) Plaintiff also points to paragraphs 29 and 33 of the Amended Complaint as alleging that, after being required to take the anti-racism training, Plaintiff "continued speaking out against such training and the infiltration of Critical Race ideology in the workplace." (Pl.'s Opp'n, ECF 29 at 10.) But a reading of paragraphs 29 and 33 clearly indicates that they relate to the gender identity training, from which Plaintiff had sought to be exempt, not to the anti-racism training.

Even if the Court finds that the Amended Complaint sufficiently alleges that Plaintiff voiced – rather than internalized – his objection to the anti-racism training, Plaintiff still fails to plausibly allege that DHS treated him differently than similarly situated employees (those reporting to the same supervisor *and who also objected to the anti-racism training and purported indoctrination*) outside his racial class. Simply put,

---

[2] Notably, the Amended Complaint alleges that Plaintiff sought an exemption from the gender identity awareness training, *not from the race discrimination training*. (Am. Compl. ¶¶20, 23-24.)

[3] Plaintiff's multiple references to his son, allegedly a DHS employee also required to take the trainings, is perplexing. His son is neither a co-plaintiff nor a similarly situated employee reporting to the same supervisor outside Plaintiff's protected class.

the Amended Complaint is devoid of any factual allegations pertaining to *how* Plaintiff was treated after purportedly objecting to DHS' anti-racism training and 'indoctrination' versus *how* similarly situated employees outside his class were treated *after they lodged similar objections*. *See Clark v. Runyon*, 218 F.3d 915- 918-19 (8th Cir. 2000) (noting the plaintiff's inability to identify a single similarly situated employee who dealt with the same supervisor, was subject to the same standards, and "engaged in the same conduct without any mitigating or distinguishing circumstances"). Dismissal is required because the Amended Complaint does not plausibly allege facts satisfying the fourth element of the race discrimination claim.

Furthermore, dismissal is also required because Plaintiff fails to allege facts from which the Court could plausibly infer he was constructively discharged by a hostile work environment. Plaintiff fails to meet the extremely high burden for plausibly stating a hostile-environment constructive discharge claim. (*See* Defs.' opening memo., ECF 22 at 12.) The Amended Complaint does not allege any facts showing that DHS created a hostile work environment for Plaintiff that was so egregious and intolerable that it would have compelled a reasonable person to feel he had no choice but to resign. *See, e.g., Pa. State Police v. Suders*, 542 U.S. 129, 146-47 (2004) (holding that a plaintiff advancing a compound hostile-environment constructive discharge claim must show working conditions "so intolerable that a reasonable person would have felt compelled to resign"); *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (stating that, for constructive discharge, conditions must be "sufficiently extraordinary and egregious"). Here, Plaintiff

5

has failed to meet the *Twombly* standard of pleading any facts from which the court could infer that work conditions were so intolerable that he had no choice but to quit.

Nor does requiring all employees to undergo anti-racism training plausibly show that DHS intended to force Plaintiff to quit. *See Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir. 1981) ("To constitute a constructive discharge, the employer's actions must have been taken with the intention of forcing the employee to quit."); *Bourgeois v. U.S. Coast Guard*, 151 F. Supp. 3d 726, 739-40 (W.D. La. 2015) (concluding that requiring employees to watch anti-harassment video did not constitute an adverse employment action).

In sum, dismissal is also required because Plaintiff falls well short of sufficiently pleading that he suffered an adverse employment action.

## II. PLAINTIFF FAILS TO PLEAD A PLAUSIBLE RELIGIOUS DISCRIMINATION CLAIM.[4]

Plaintiff fails to plausibly plead the third and fourth elements of his religious discrimination claim. (*See* Defs.' Opening memo., ECF 22 at 14-17.) To show he has plausibly stated the third element (suffering an adverse employment action), Plaintiff confusingly argues that he "was constructively discharged after the hostility created by the refusal for exemption from ideological indoctrination and the subsequent voicing of his beliefs." (Pl.'s Opp'n, ECF 29 at 13.) But neither DHS' denial of Plaintiff's request for a training exemption nor Plaintiff's purported "subsequent voicing of his beliefs" plausibly demonstrate constructive discharge by hostile work environment.

---

[4] Plaintiff's Opposition makes clear that he is not pursuing a failure to accommodate claim. (Pl.'s Opp'n, ECF 29 at 12-16.)

Additionally, in his Opposition, Plaintiff cites paragraph 29 of the Amended complaint, which baldly states that he "was demeaned and treated with hostility by DHS supervisors." (Pl.'s Opp'n, ECF 29 at 13.) But such vague allegations do not constitute facts from which the Court could plausibly infer constructive discharge from a hostile work environment. *See Scurlock v. Mo. Hous. Dev. Comm'n*, No. 4:20-CV-01614-SPM, 2021 WL 1945857, at *5 (E.D. Mo. May 14, 2021) (ruling that plaintiff's "vague and conclusory" allegations failed to state a hostile work environment claim). Similarly, paragraph 33 merely *labels* the workplace as "discriminatory, hostile, and demeaning." Plaintiff has failed under *Twombly* to plead any factual content that would allow the Court to infer he was constructively discharged because of a hostile work environment.

Finally, Plaintiff fails to acknowledge the temporal component of the allegations, which eviscerates any plausibility of his constructive discharge from a hostile work environment. Plaintiff learned on October 27, 2020 that his exemption request had been denied. (ECF 15-1 at 2.) Plaintiff alleges he notified DHS of his constructive discharge on November 2, 2020. (Am. Compl. ¶32.) Yet, back on October 6, 2020 – before learning of the denial of his exemption request – Plaintiff had already submitted his retirement notice. (ECF 12-2.)

Plaintiff asserts that Defendants' motion to dismiss improperly references the October 6, 2020 email that Plaintiff sent to supervisor Ploog and to Human Resources staff (ECF 12-2), contending that it is outside the four corners of the Amended Complaint. (Pl.'s Opp'n, ECF 29 at 20.) Under well-established precedent, however, courts may consider documents referenced in a complaint without converting the motion to one for summary

7

judgment. *E.g.*, *Ashanti v. v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012) (explaining that when deciding a motion to dismiss, courts may consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings") (citation omitted); *see also Palmer v. Cnty. of Anoka*, 200 F. Supp. 3d 842, 845, 846 n.1 (D. Minn. 2016) (explaining that the court properly considered plaintiff's emails and Facebook postings, referenced in the complaint, without converting the motion to dismiss to one for summary judgment).

Here, Plaintiff opened the door by pleading that Defendants responded in their EEOC charge that Plaintiff had not been constructively discharged because he was planning to retire. (Am. Compl. ¶38.) Thus, as part of DHS' response to Plaintiff's EEOC claims, the October 6, 2020 email (Doc. 12-2) has been incorporated by reference in paragraph 38 of the Amended Complaint.[5] Notably, Plaintiff does not challenge the authenticity of the October 6, 2020 email, which was *from* Plaintiff.[6]

Nor does Plaintiff sufficiently plead the fourth required element of a religious discrimination claim. (*See* Defs.'s opening memo, ECF 22 at 16-17.) Plaintiff has not pleaded any facts showing that other employees outside his class *who objected to the training* were treated any differently. In his Opposition, Plaintiff asserts that he has alleged other facts giving rise to an inference of discrimination: namely, two years earlier, a night

---

[5] Alternatively, to the extent this motion is converted to one for summary judgment, the outcome would be the same.

[6] Plaintiff's reliance on *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326 (7th Cir. 2002), is unavailing. In that case, the employee submitted her resignation letter only after "seeing her belongings packed up and her office being used for storage." *Id.* at 332.

8

supervisor told him he could be fired for his beliefs; and DHS' refusal of his request for an exemption from the gender identity training. (Pl's Opp'n, ECF 29 at 13.)

But the night supervisor's alleged one-time statement, more than two years before Plaintiff's separation from employment, is nothing more than a stray remark. *See Smith v. DataCard Corp.*, 9 F. Supp. 2d 1067, 1079 (D. Minn. 1998) (noting the legal insufficiency of "stray remarks, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process"). Moreover, denial of a request to avoid across-the-board diversity training does not allow the Court to infer discrimination. In any event, neither the night supervisor's alleged stray remark nor the denial of Plaintiff's exemption request plausibly shows that Plaintiff was subsequently subjected to a hostile work environment so egregious that he had no reasonable option other than to quit.

Because Plaintiff has not plausibly pleaded the requisite third and fourth elements of a religious discrimination claim, dismissal is required.

### III.    PLAINTIFF'S RETALIATION COUNT FAILS TO STATE A CLAIM.

The parties agree that, to state a viable Title VII retaliation claim, Plaintiff must first plead facts from which the Court could draw the inference that Plaintiff engaged in "protected activity," which is defined as opposing "a practice that Title VII forbids" or participating in a Title VII investigation, proceeding, or hearing. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (citing 48 U.S.C. § 2000e–3(a)).

Here, Plaintiff fails to plausibly plead that he engaged in protected activity. Instead, Plaintiff vaguely asserts that he "voiced dissent" to: (1) the mandate of additional training; (2) disparate treatment of those who sought exemptions; and (3) the threat of being

9

terminated based on his religious beliefs. (Am. Compl. ¶60.) First, being required to attend across-the-board diversity trainings is simply not a discriminatory practice that Title VII forbids. *See Bourgeois,* 151 F. Supp. 3d at 739-40 (requiring employees to watch anti-harassment video did not constitute an adverse employment action).[7] Moreover, the Amended Complaint does contain factual allegations showing that, before initiating his Title VII retaliation claim, Plaintiff ever "voiced dissent" about experiencing disparate treatment *after* seeking an exemption on September 10, 2020 from the gender identity training or complained about being threatened with termination back on October 12, 2018 because of his religious beliefs.

Even assuming arguendo that Plaintiff has plausibly pleaded protected activity, Plaintiff has not sufficiently pleaded the remaining required elements of a retaliation claim – an adverse employment action; and a causal connection between the protected activity and the adverse employment action. *See, e.g.*, *Barber v. C1 Truck Driver Training*, 656 F.3d 782, 801-02 (8th Cir. 2011) (setting forth required elements of a Title VII retaliation claim). As previously briefed, Plaintiff has not pleaded facts from which the Court can infer that he was constructively discharged by a hostile work environment. (*See supra* at p. 5; ECF 22 at 21-22.) Absent an adverse employment action, Plaintiff fails to state a claim and no further analysis is required.

---

[7] In fact, the U.S. Equal Employment Opportunity Commission ("EEOC") is "committed to providing training and technical assistance, outreach and education programs to assist employers, employees and stakeholder groups understand and prevent discrimination." *See* EEOC's webpage titled *Outreach, Education & Technical Assistance*, which is publicly available at: https://www.eeoc.gov/outreach-education-technical-assistance (last viewed June 9, 2022).

**IV.     THE SECTION 1983 ACTION AGAINST THE COMMISSIONER FAILS.**

In Count IV, Plaintiff asserts section 1983 claims against the Commissioner, in her individual capacity, for First Amendment retaliation and compelled speech. But Plaintiff fails to allege *any* unconstitutional action on the part of the Commissioner. *See Whitson v. Stone Cnty. Jail,* 602 F.3d 920, 927-28 (8th Cir. 2010) (holding that an official may only be liable for a section 1983 claim if the official personally committed the constitutional violation). Citing paragraph 65 of the Amended Complaint, Plaintiff's Opposition asserts that the Commissioner's "constant correspondence advocating for the changing of 'minds for life' influenced and advanced a policy where dissenting perspectives were not tolerated." (Pl.'s Opp'n, ECF 29 at 28.) But paragraph 65 is totally inapposite. Plaintiff likely meant to reference paragraph 70, which states: "Plaintiff's constructive discharge was an official act of DHS policy because both the required training and infiltration of CRT *was promulgated by multiple DHS supervisors*, under the direction of Defendant Harpstead through several emails, including one where she urged a focus on 'the training and brave conversations we need to have to change…minds for life.'" (Emphasis added.)

The allegations in paragraph 70 underscore the conduct of DHS supervisors, not of Commissioner Harpstead. Simply put, there are no allegations the Commissioner of DHS was personally involved in anything related to Plaintiff's employment, much less any personal conduct that created a hostile work environment sufficient to satisfy the constructive discharge standard.

Indeed, throughout the Amended Complaint, Plaintiff's allegations are directed at various DHS supervisors, not at the Commissioner. (*See* Am. Compl., ¶¶30, 66, 69-71.) It is well established, however, that there is no vicarious liability for a section 1983 claim. *Kulow v. Nix*, 28 F.3d 855, 858 (8th Cir. 1994). Accordingly, Plaintiff's claims against the Commissioner, in her individual capacity, must be dismissed.

Plaintiff's First Amendment claims also fail on the additional substantive grounds outlined below.

### A.   Plaintiff Fails to State a Viable First Amendment Retaliation Claim.

Plaintiff's Opposition does not identify any First Amendment protected activity. Instead, Plaintiff posits that gender identity and what he views as Critical Race Theory are matters of public concern. Nonetheless, the analysis must begin with the actual conduct allegedly entitled to protection. For First Amendment protection, a plaintiff must meet the threshold requirement of showing that "the employee spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citing *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568 (1968)). Speech addresses a matter of public concern when it relates "to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983).

The Amended Complaint identifies two alleged instances of constitutionally protected activity: (1) Plaintiff's request to Human Resources for an exemption from the gender identity awareness training; and (2) Plaintiff's expression of his viewpoint on gender when answering a personal question from a night supervisor. (Am. Compl. ¶¶64-

65.) Notably, the Amended Complaint does not allege any protected activity relating to the anti-racism training.

As for the first statement, while gender identity may be a popular topic in public discourse, requesting an exemption from across-the-board training is not a matter of public concern. Rather, it concerns a condition of employment. The First Amendment does not "constitutionalize" employee grievances. *Garcetti*, 547 U.S. at 420 (citing *Connick*, 461 U.S. at 154).

As for the second statement, Plaintiff's responses about gender to a night supervisor back in 2018 were not of concern to the community. Plaintiff believed it was his duty to respond to the supervisor because he was "on shift." (Am. Compl. ¶28.) Plaintiff did not publicly post his viewpoint about gender identity or about DHS' training program.[8] Plaintiff was simply answering the supervisor's questions while at work about his personal views. *See Connick*, 461 U.S. at 147 ("[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.").

---

[8] Conversely, in *Henry v. Johnson*, 950 F.3d 1005, 1012 (8th Cir. 2020), *cert. denied*, 141 S. Ct. 669 (Nov. 2, 2020), the Eighth Circuit held that a state highway patrol employee spoke as a citizen on matters of public concern when he made statements on social media, to a news reporter, and to the victim's family regarding a cover-up relating to an arrestee's drowning.

Plaintiff's reliance on the *Meriwether* decision is misplaced. (Pl.'s Opp'n, ECF 29 at 32.) That case underscores the principle that "professors at public universities retain First Amendment protections . . . when engaged in core academic functions, such as teaching and scholarship." *Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021); *see also Buchanan v. Alexander*, 919 F.3d 847, 852-53 (5th Cir. 2019) ("[A]cademic freedom is a special concern of the First Amendment."). Public universities serve the public's interest "in exposing our future leaders to different viewpoints," as well as a professor's "right to disseminate his own opinion." *Meriwether*, 992 F.3d at 505, 508 (reasoning that a professor's "in-class speech" about gender addresses a matter of public concern) (citing *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 679 (6th Cir. 2001)). The present case involves no such public concern.

Even if the Court were to find that Plaintiff has plausibly pleaded protected activity, the viability of Plaintiff's claim irretrievably breaks down when turning to the next required element of a First Amendment retaliation claim – that the government official took adverse action to chill a person of ordinary firmness from continuing in the activity. (*See* Defs.' opening memo., ECF 22 at 26-28.) The Amended Complaint lacks any allegations from which the Court could infer that the Commissioner, herself, took any adverse action against Plaintiff to chill his exercise of First Amendment right to request an exemption from training or to respond to a question about his personal viewpoint toward gender. Curiously, Plaintiff instead alleges in his Opposition Memorandum that his purported constructive discharge was "an official act of DHS policy," not any personal conduct on the part of the

14

Commissioner. (Pl.'s Opp'n, ECF 29 at 33-34.) In sum, Plaintiff fails to state a First Amendment retaliation claim against the Commissioner.

### B. Plaintiff Fails to State a Viable Compelled Speech Claim.

Plaintiff has failed to state a claim of compelled speech in the absence of any allegation that the Commissioner ever *compelled* him to make or refrain from making any anti-racism or gender identity statements. (*See* Defs.' opening memo., ECF 22 at 31-32.) Instead, the Amended Complaint merely alleges that the assistant commissioner who presented the anti-racism training told employees, "we need all of you to do this." (*Id.*, ¶15.) Nor does Plaintiff allege facts showing that the Commissioner (or anyone else) personally told Plaintiff he would be subject to discipline unless he made or refrained from making certain statements. *See Ashcroft*, 556 U.S. at 677 ("[T]o state a claim based on a violation of a clearly established right, respondent must plead sufficient factual matter. . . ."). In sum, Plaintiff fails to plausibly state a compelled speech claim.

### C. Plaintiff Lacks Controlling Authority to Overcome the Commissioner's Qualified Immunity Defense.

Even if Plaintiff had pleaded plausible claims of First Amendment retaliation and compelled speech (he has not), the Commissioner is still entitled to qualified immunity. Plaintiff's Opposition only addresses the first prong of the qualified immunity test – whether there was a violation of a constitutional right. However, even where a plaintiff plausibly pleads a constitutional violation, an official is still entitled to qualified immunity unless the constitutional right was clearly established at the time of the alleged violation. *E.g.*, *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (abrogated on other grounds); *Anderson v.*

*Creighton*, 483 U.S. 635, 646 n.6 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

In other words, to overcome the applicability of qualified immunity, a plaintiff must show "that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotations omitted). "[E]xisting law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (citation omitted) (noting that this immunity "protects all but the plainly incompetent or those who knowingly violate the law."). The controlling authority must present "similar circumstances." *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *see also Mumm v. Mornson*, 708 N.W.2d 475, 485 (Minn. 2006) (holding that qualified immunity is only defeated where the defined constitutional rule applies with "obvious clarity" to the particular scenario at issue).

Here, Plaintiff has failed to identify any such controlling authority that would have placed Commissioner Harpstead on notice that she violates an individual employee's First Amendment rights when the agency that she oversees requires across-the-board anti-racism and gender identity awareness training.

In sum, Commissioner Harpstead is entitled to qualified immunity for Plaintiff's section 1983 claims.

## CONCLUSION

Based on the above argument, the Court should dismiss the Amended Complaint in its entirety and with prejudice.

Dated: June 15, 2022

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

s/ Kathleen M. Ghreichi
KATHLEEN M. GHREICHI
Assistant Attorney General
Atty. Reg. No. 023834X

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2128
(651) 757-1490 (Voice)
kathleen.ghreichi@ag.state.mn.us

ATTORNEY FOR DEFENDANTS

|#5255426-v2