UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Joseph Norgren,

        Plaintiff,

v.

Minnesota Department of Human Services, and Commissioner Jodi Harpstead, in her individual capacity,

        Defendants.

MEMORANDUM OPINION AND ORDER
Civil No. 22-489 ADM/TNL

---

Anne St. Amant, Esq. and Daniel J Cragg, Esq., Eckland & Blando LLP, Minneapolis, MN, on behalf of Plaintiff.

Kathleen M Ghreichi, Assistant Minnesota Attorney General, Minnesota Attorney General's Office, St. Paul, MN, on behalf of Defendants.

---

## I. INTRODUCTION

On November 8, 2022, the undersigned United States District Judge heard oral argument on Defendants Minnesota Department of Human Services ("DHS") and Commissioner Jodi Harpstead's ("Commissioner Harpstead") Motion to Dismiss the Amended Complaint [Docket No. 19]. For the reasons set forth below, the Motion is granted.

## II. BACKGROUND

Plaintiff Joseph Norgren ("Norgren") is a Christian and 50% Native American. Am. Compl. [Docket No. 15] ¶ 7. He worked for DHS for 27 years as a security counselor at the Minnesota Security Hospital ("Security Hospital") in St. Peter, Minnesota. Id. ¶¶ 9-10. Norgren's son also works at the Security Hospital as a security counselor. Id. ¶ 11.

On October 12, 2018, while Norgren was working an overnight shift at the Security Hospital, he was asked by night-shift supervisor Luke Pherson ("Pherson") how many genders exist. Id. ¶¶ 27-28. Norgren responded that there are only two genders and sexes. Id. ¶ 28. Pherson became angry and said Norgren could be fired for the way he thought and spoke. Id. Norgren alleges that after this conversation he "noticed a difference" in how he and his son were treated as employees. Id. ¶ 29. Norgren began avoiding his supervisors for fear of being terminated for his beliefs. Id.

Approximately two years later in August of 2020, Norgren's supervisor, Paul Ploog ("Supervisor Ploog"), informed Norgren and 31 of his colleagues that they were required to complete computer-based workplace training units on anti-racism and gender identity. Id. ¶¶ 12-13, 16-17; Ghreichi Decl. [Docket No. 12] Ex. A. The training units were titled "How to be Anti-Racist" and "Understanding Gender Identity and Expression: Moving Beyond the Binary." Id. ¶¶ 13, 16. Commissioner Harpstead sent an email to employees urging them to focus on "the training and brave conversations we need to have to change minds . . . for life." Am. Compl. ¶¶ 30, 70.

Norgren opposed the anti-racism training because he equates it to Critical Race Theory ("CRT"), which he views as violating "the traditional view of equality under Title VII." Id. ¶ 19. Norgren also opposed the gender identity training because he views the concept of nonbinary gender to be "contrary to his sincerely held religious belief." Id. ¶ 21.

Although he "generally opposed" the anti-racism training, Norgren did not notify DHS management that he objected to the training. Id. ¶ 20. He did, however, voice an objection to the gender identity training to Supervisor Ploog on September 10, 2020, and asked for a religious exemption from the training. Id. ¶¶ 20, 23.

On October 27, 2020, the Director of DHS' Equal Opportunity and Access Division ("EOAD") notified Norgren that his request for a religious exemption was denied. Id. ¶ 24, Ex. A at 2. On Friday, October 30, 2020, Norgren emailed the EOAD Director and stated that "your denial of my request and subjecting me to participating in the [gender identity] training . . . subjects me to harassment." Id. Ex. A at 2. Norgren asked whether there was an appeal process for the decision. Id. On Monday, November 2, 2020, the EOAD Director responded that "there is no appeal from this decision." Id. Ex. A at 1.

Approximately two hours after the EOAD Director's response had been sent, Norgren replied to the EOAD Director in an email stating:

> Your decision has solidified and confirmed my contemplation of not continuing my 27 year service with the State of Minnesota. This year has created a hostile and uncomfortable work environment with the implementation and propagation of "Critical Theory" [sic] as evidenced by the State of Minnesota and DHS trainings and emails from commissioner Harpstead and the Strategic Anti-Racism Team (StART). As well as the weekly videos sent out by DHS on info link. It is unfortunate that I feel forced to prematurely separate from State of Minnesota service.

Id.

In June 2021, Norgren filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). Id. ¶ 37. DHS responded to Norgren's claims of discrimination and retaliation by claiming he was not constructively discharged, as he had already decided to retire. Id. ¶ 38. DHS' response to the EEOC claims included the following email sent by Norgren to Supervisor Ploog and Human Resources staff on October 6, 2020, three weeks before Norgren's request for a religious exemption was denied:

> Hello Paul, Per our discussion on 10-6-2020, I am sending this email to inform you of my retirement date. I have and will use, pre-approved vacation beginning

3

> November 16, 2020 through and including January 5, 2021. I will not return to work on January 6, 2021 as that will be my requested official retirement date. Please forward this to those responsible for assisting me with the retirement process. I have already contacted Betsy Dalluge of MSRS and discussed retirement with her. Thank you for your help.

Greichi Decl. Ex. B. The EEOC issued Norgren a Notice of Right to Sue on January 3, 2022. Am. Compl. ¶ 40, Ex. B.

Norgren filed this lawsuit on February 25, 2022. See generally Compl. [Docket No. 1]. He claims he was constructively discharged on January 6, 2021, due to the "threat of being terminated for his religious beliefs, as well as the mandated training and refusal for exemption." Am. Compl. ¶ 33. Norgren alleges that he intended to work an additional three years to obtain a higher pension, but that "the conditions at DHS had become so unworkable that he had no choice but to retire." Id. ¶¶ 35, 39.

Norgren asserts claims against DHS for racial and religious discrimination and retaliation under Title VII, and for racial discrimination and reprisal under the Minnesota Human Rights Act ("MHRA"). Id. ¶¶ 41-62, 78-89. Norgren also asserts a § 1983 claim against Commissioner Harpstead for First Amendment retaliation and compelled speech. Id. ¶¶ 63-77. Defendants move to dismiss all claims pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(h)(3).

### III. DISCUSSION

**A. Motion to Dismiss Standard**

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In considering a motion to dismiss, the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true.

4

Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994); Ossman v. Diana Corp., 825 F. Supp. 870, 879-80 (D. Minn. 1993).  Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party.  Ossman, 825 F. Supp. at 880.

When deciding a motion to dismiss, the Court may consider "the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record."  Illig v. Union Elec. Co., 652 F.3d 971, 976 (8th Cir. 2011).  Materials embraced by the pleadings include "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading."  Kushner v. Beverly Enters., Inc., 317 F.3d 820, 831 (8th Cir. 2003).

A pleading must relate sufficient "facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Although detailed factual allegations are not required, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555 (internal quotation marks and alterations omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 678 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original).

A party may also move for dismissal under Rule 12 based on lack of subject matter jurisdiction.  See Fed. R. Civ. P. 12(b)(1). Under Federal Rule of Civil Procedure 12(h)(3), "[i]f

5

the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."

**B. Title VII Race Discrimination (Count I)**

In Count I, Norgren alleges that DHS unlawfully discriminated against him based on his race in violation of Title VII, 42 U.S.C. § 2000e-2. Specifically, Norgren alleges that DHS created a hostile environment by "discriminating against [Norgren], as a person of color, for his refusal to subscribe to CRT and 'internalized whiteness.'" Am. Compl. ¶ 43. Norgren alleges he was "constructively discharged from his position when he was forced to retire early due to the hostile workplace environment resulting from his opposition to the infiltration and forced imposition of CRT ideology." Id. ¶ 44.

To establish a prima facie case of race discrimination, Norgren must show: 1) he is a member of a protected class; 2) was meeting the legitimate expectations of his employer; 3) suffered an adverse employment action; and 4) that similarly situated employees who are not members of the protected class were treated differently. Singletary v. Mo. Dep't of Corr., 423 F.3d 886, 891 (8th Cir. 2005); Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000).

Although a plaintiff need not plead facts establishing a prima facie case for their Title VII discrimination claim at the pleading stage, the elements of a prima facie case "are part of the background against which a plausibility determination should be made," and "may be used as a prism to shed light upon the plausibility of the claim." Blomker v. Jewell, 831 F.3d 1051, 1056 (8th Cir. 2016) (quoting Rodriguez–Reyes v. Molina–Rodriguez, 711 F.3d 49, 54 (1st Cir. 2013)). As such, "the allegations in a complaint must give plausible support to the reduced prima facie requirements that arise under McDonnell Douglas."[1] Warmington v. Bd. of Regents

---

[1] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

of Univ. of Minn., 998 F.3d 789, 796 (8th Cir. 2021) (emphasis in original) (internal quotations omitted).

Here, the Amended Complaint fails to allege facts plausibly supporting the third and fourth elements of Norgren's race discrimination claim.

**1. No Adverse Employment Action**

Norgren alleges he suffered an adverse employment action because he was constructively discharged due to the hostile workplace environment that resulted from his opposition to the anti-racism training. Am. Compl. ¶ 44.

To prove constructive discharge, a plaintiff must show: "(1) a reasonable person in his situation would find the working conditions intolerable, and (2) the employer intended to force him to quit." Carpenter v. Con-Way Cent. Express, Inc., 481 F.3d 611, 616–17 (8th Cir. 2007). A plaintiff asserting a compound hostile-environment constructive discharge claim bears a heavy burden that requires "something more" than showing a hostile work environment. Pa. State Police v. Suders, 542 U.S. 129, 147 (2004). While the standard for a hostile work environment is satisfied by showing that the offending behavior is "sufficiently severe or pervasive to . . . create an abusive working environment," the threshold for establishing a hostile-environment constructive discharge claim is higher and requires a plaintiff to show "working conditions so intolerable that a reasonable person would have felt compelled to resign." Id. The intolerability of working conditions is judged by an objective standard, rather than the plaintiff's subjective feelings. Phillips v. Taco Bell Corp., 156 F.3d 884, 890 (8th Cir. 1998).

Norgren alleges that he "endured months of reviewing weekly communications and videos sent by DHS" that contradicted his view of equality, and that he was "forced to retire early due to the hostile work environment resulting from his opposition" to the anti-racism

7

training. Am. Compl. ¶¶ 31, 44. These allegations fail to show working conditions so intolerable that a reasonable person would have felt compelled to resign. Requiring all employees to undergo diversity training does not amount to abusive working conditions, and does not plausibly show that DHS imposed across-the-board training with the intention of forcing Norgren to quit. See Johnson v. Bunny Bread Co., 646 F.2d 1250, 1256 (8th Cir. 1981) ("To constitute a constructive discharge, the employer's actions must have been taken with the intention of forcing the employee to quit."); Bourgeois v. United States Coast Guard, 151 F. Supp. 3d 726, 740 (W.D. La. 2015) (concluding that requiring employees to watch anti-harassment video about cultural diversity did not constitute an adverse employment action).

Although Norgren alleges that a hostile work environment resulted from his opposition to the content of the training, the Amended Complaint does not include any factual allegations of objectionable conduct by DHS following Norgren's opposition, let alone conduct that would support a hostile workplace environment so intolerable that a reasonable person would feel compelled to resign. As such, the Amended Complaint fails to set forth sufficient factual allegations to show that Norgren is entitled to relief. See Warmington, 998 F.3d at 796 ("[T]he complaint must include sufficient factual allegations to provide the grounds on which the claim rests.") (emphasis in original) (internal quotations omitted).

### 2. Similarly Situated Employees

Even if Norgren had adequately alleged an adverse employment action, dismissal of Count I is required because the Amended Complaint fails to allege facts to plausibly infer that similarly situated employees who are not members of Norgren's protected class were treated differently. A similarly situated employee "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or

8

distinguishing circumstances." Evance v. Trumann Health Servs., LLC, 719 F.3d 673, 678 (8th Cir. 2013).

The Amended Complaint does not allege any factual allegations to explain how Norgren was treated after voicing his opposition to the anti-racism training, much less how his treatment compared to that of similarly situated employees outside his class who lodged similar objections. See Clark, 218 F.3d at 918 (concluding plaintiff failed to identify a similarly situated employee who dealt with the same supervisor, was subject to the same standards, and "engaged in the same conduct without any mitigating or distinguishing circumstances").

Accordingly, Count I is dismissed for failure to state a claim for race discrimination under Title VII.

## C.  Title VII Religious Discrimination (Count II)

In Count II, Norgren alleges that the DHS discriminated against him and treated him "distinct[ly] from other similarly situated employees" due to his religious beliefs. Am. Compl. ¶ 57.

Title VII prohibits an employer from "discharge[ing] any individual, or otherwise discriminat[ing] against any individual with respect to his . . . employment" because of that individual's religion. 42 U.S.C. § 2000e-2(a)(1). To establish a prima facie case of religious discrimination based on disparate treatment, Norgren must show:

> (1) the plaintiff was a member of a protected class because of the plaintiff's religious affiliation or beliefs; (2) the employee informed the employer of his religious beliefs; (3) the plaintiff was qualified for the position; (4) despite the plaintiff's qualifications, the plaintiff was fired or suffered an adverse employment action; and (5) similarly situated employees outside of the plaintiff's protected class were treated differently or there is other evidence giving rise to an inference of discrimination.

9

Frangesh v. Potter, No. 06-4951 (DWF/SRN), 2007 WL 4224054, at *4–5 (D. Minn. Nov. 27, 2007) (quoting Brasch v. Peters, 479 F. Supp. 2d 1045, 1064 (E.D. Mo. 2007)).

Here, the Amended Complaint fails to plead facts to plausibly support the fourth and fifth elements of a disparate treatment religious discrimination claim. As to the fourth element (an adverse employment action), Norgren alleges he was constructively discharged on January 6, 2021, "when he was forced to retire early due to the hostile workplace environment resulting from the threat that he could be terminated for his religious beliefs." Am. Comp. ¶ 55.

The alleged threat of termination was a comment by a night-shift supervisor during a single conversation in October 2018. Id. ¶ 27. Although the Amended Complaint vaguely alleges that after the conversation Norgren "noticed a difference" in how he and his son were treated as employees, no factual allegations are provided to shed light on how Norgren and his son were treated after the conversation. See id. ¶ 29. Nor does the Amended Complaint allege facts showing that DHS had any interactions at all with Norgren about his views on gender identity during the time between the October 2018 conversation and the August 2020 announcement about the gender identity training. The isolated conversation in 2018 does not constitute a working condition so intolerable that a reasonable employee would have felt compelled to resign two years later.

Norgren also alleges that he was constructively discharged due to a hostile work environment resulting from DHS' "mandated training and refusal for exemption." Am. Compl. ¶ 33. As stated earlier, mandating all employees to undergo diversity training does not plausibly show that DHS intended to force Norgren to quit. Additionally, the refusal for an exemption to the gender identity training cannot have been a basis for Norgren's alleged constructive discharge because Norgren submitted his retirement notice to his supervisor and Human

Resources on October 6, 2020---three weeks <u>before</u> the DHS denied Norgren's exemption request on October 27, 2020.  See Greichi Decl. Ex. B (October 6, 2020 email).[2]  Even if the October 6, 2020 email were not considered, the Amended Complaint does not allege any harassing conduct by DHS toward Norgren, much less conduct so severe and pervasive that an objectively reasonable person would have felt forced to resign.  Accordingly, the Amended Complaint fails to allege facts to plausibly support an adverse employment action.

Regarding the fifth requirement (that similarly situated employees were treated differently or that there is other evidence giving rise to an inference of discrimination), Norgren has not pleaded any facts showing that other employees outside his protected class who sought an exemption from the religious training were treated differently.  Nor does Norgren allege other facts giving rise to an inference of discrimination.  The night-shift supervisor's alleged one-time inquiry about the concept of binary gender does not give rise to a plausible inference of discrimination because the statement was a solitary stray remark made two years before Norgren ended his employment with DHS.  See Smith v. DataCard Corp., 9 F. Supp. 2d 1067, 1079 (D. Minn. 1998)  (noting the legal insufficiency of "stray remarks, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process").

---

[2]  Norgren argues that Defendants' motion to dismiss improperly references the October 6, 2020 email notifying his supervisor and Human Resources staff of his January 6, 2021 retirement date.  However, the email is embraced by the pleadings because Paragraph 38 of the Amended Complaint references DHS' response to Norgren's EEOC claims, and the October 6, 2020 email was included in the DHS' response to those claims.  Norgren does not challenge the authenticity of the October 6, 2020 email.  As such, the Court may consider the email without converting the motion to dismiss to one for summary judgment.  See  Kushner, 317 F.3d at 831 (stating that when deciding a motion to dismiss, courts may consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading").

Accordingly, Count II is dismissed for failure to state a claim for religious discrimination under Title VII.

**D. Title VII Retaliation (Count III)**

In Count III, Norgren alleges that DHS retaliated against him in violation of Title VII. The anti-retaliation provision of Title VII prohibits an employer from retaliating against an employee who has "'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 59 (2006) (quoting § 2000e–3(a)).

Absent direct evidence, a plaintiff establishes a prima facie case of retaliation by showing "he engaged in protected activity; he suffered a materially adverse action that would deter a reasonable employee from making a charge of employment discrimination; and there is a causal connection between the protected activity and the adverse action." Gibson v. Am. Greetings Corp., 670 F.3d 844, 856 (8th Cir. 2012) (quoting Barber v. C1 Truck Driver Training, LLC, 656 F.3d 782, 801-02 (8th Cir. 2011)). To show causation, a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013).

The Amended Complaint fails to plead a plausible claim for retaliation because no facts are alleged from which the Court could infer that Norgren engaged in protected activity. Norgren alleges that he "voiced dissent" to: (1) the mandate of additional training; (2) the disparate treatment of those who sought exemptions; and (3) the threat of being terminated for his religious beliefs. Am. Compl. ¶ 60; Pl. Mem. Opp'n [Docket No. 29] at 23-24. However, being required to attend across-the-board diversity training is not a discriminatory practice under Title VII. See Bourgeois, 151 F. Supp. 3d at 739-40. Additionally, the Amended Complaint

does not include any factual allegations showing that Norgren "voiced dissent" about the disparate treatment of employees or the threat of being terminated. <u>See generally</u> Am. Compl.

Even if Norgren had plausibly alleged that he engaged in protected activity, the Amended Complaint fails to allege facts giving rise to an inference that Norgren suffered a materially adverse employment action. Norgren baldly alleges that DHS retaliated against him "by making the working environment at the Security Hospital so hostile and unbearable that [Norgren] was constructively discharged." Am. Compl. ¶ 61. As already discussed, the Amended Complaint does not include any factual allegations of conduct by DHS from which the Court could plausibly infer that Norgren was constructively discharged by a hostile work environment.

Accordingly, Count III is dismissed for failure to state a retaliation claim under Title VII.

**E. Section 1983 Claim Against Commissioner Harpstead (Count IV)**

In Count IV, Norgren asserts a claim under 42 U.S.C. § 1983 against Commissioner Harpstead, in her individual capacity, for First Amendment retaliation and compelled speech. Defendants argue that the claim fails because: 1) Norgren has not alleged that Commissioner Harpstead personally committed a constitutional violation; 2) Norgren has not alleged facts to plausibly support the elements of a First Amendment retaliation or compelled speech claim; and 3) Commissioner Harpstead is entitled to qualified immunity.

**1. No Individual Actions by Commissioner Harpstead**

It is well established that in actions under § 1983, government officials cannot be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior. <u>Iqbal</u>, 556 U.S. at 676; <u>Whitson v. Stone Cnty. Jail</u>, 602 F.3d 920, 928 (8th Cir. 2010). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each

Government-official defendant, <u>through the official's own individual actions</u>, has violated the Constitution." Iqbal, 556 U.S. at 676 (emphasis added).

The Amended Complaint does not allege personal conduct on the part of Commissioner Harpstead in violation of Norgren's constitutional rights. Instead, the allegations are directed at conduct by Supervisor Pherson, the DHS supervisors who promulgated the trainings, and the EOAD Director who denied Norgren's request for an exemption. See Am. Compl. ¶¶ 29, 66, 69-71. There are no allegations that Commissioner Harpstead had any personal interactions with Norgren or was personally involved in his employment. Although the Amended Complaint alleges that Commissioner Harpstead created a "discriminatory, hostile, and demeaning workplace environment," no factual allegations are included to support this conclusory allegation. Id. ¶ 33. Additionally, the allegation that Commissioner Harpstead sent all employees an email urging them to focus on "the training and brave conversations we need to have to change . . . minds for life" does not give rise to a plausible inference of unconstitutional conduct. Am. Compl. ¶ 70. Because Norgren does not allege specific personal conduct on the part of Commissioner Harpstead in violation of his First Amendment rights, he fails to state a claim under §1983.

**2. No Plausible First Amendment Claims**

The § 1983 claim fails for the additional reason that Norgren has not alleged facts to plausibly support the elements of a First Amendment retaliation or compelled speech claim.

**a. No First Amendment Retaliation**

To state a First Amendment retaliation claim under § 1983, a plaintiff must plead facts showing: "(1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and

(3) the adverse action was motivated at least in part by the exercise of the protected activity." Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004).

Norgren argues he suffered an adverse action when he was constructively discharged for engaging in a protected activity. Pl. Mem. Opp'n at 33-34. As discussed earlier, Norgren has failed to allege facts from which the Court could plausibly infer that he was constructively discharged. Norgren has also failed to allege personal conduct on the part of Commissioner Harpstead toward Norgren that was done to chill his exercise of his First Amendment rights. As such, the Amended Complaint fails to state a plausible First Amendment retaliation claim.

### b. No Compelled Speech

The First Amendment forbids the government from "[c]ompelling individuals to mouth support for views they find objectionable." Janus v. AFSCME, 138 S. Ct. 2448, 2463 (2018). To establish a compelled speech claim, Norgren must show: "(1) speech; (2) to which he objects; that is (3) compelled by some governmental action." Cressman v. Thompson, 798 F.3d 938, 951 (10th Cir. 2015).

Norgren has not alleged a plausible claim for compelled speech because he does not allege facts to plausibly support the third element---that his speech was compelled by governmental action. The Amended Complaint alleges in a conclusory fashion that Commissioner Harpstead compelled his speech by "demand[ing] that [Norgren] apply the 'anti-racist' trainings . . . by admitting to, confessing, or refraining from using certain language related to beliefs about racism." Am. Compl. ¶ 72. However, the Amended Complaint does not allege facts showing that Norgren or his co-workers were told that they would be deemed not to have completed the required training and be subject to discipline unless they made or refrained from making certain statements. Nor does the Amended Complaint allege that Norgren was

compelled to affirmatively make statements in front of a supervisor or submit an affidavit attesting to the statements. Because Norgren has not alleged facts showing that his speech was compelled by government action, he fails to state a First Amendment compelled speech claim.

### 3. Qualified Immunity

Even if Norgren had plausibly alleged that Commissioner Harpstead violated his First Amendment rights, Commissioner Harpstead is entitled to qualified immunity. Qualified immunity shields government officials from § 1983 lawsuits and liability "unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." LaCross v. City of Duluth, 713 F.3d 1155, 1157 (8th Cir. 2013). "To overcome qualified immunity at the pleadings stage, a plaintiff must plead facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." Partridge v. City of Benton, Ark., 929 F.3d 562, 565 (8th Cir. 2019) (internal quotation marks and alterations omitted). Regarding the second prong, "clearly established law should not be defined a high level of generality," and must be "particularized to the facts of the case." White v. Pauly, 137 S. Ct. 548, 552 (2017) (internal quotation marks omitted).

Norgren has not identified (and the Court has not found) any controlling cases with similar facts that would have put Commissioner Harpstead on notice that she was violating an employee's First Amendment rights by overseeing an agency that required across-the-board anti-racism and gender identity training. Because Commissioner Harpstead did not violate a right that was clearly established at the time of the alleged conduct, she is entitled to qualified immunity on the § 1983 claims.

### F. State Law Claims Against DHS (Counts V and VI)

Defendants argue that the MHRA claims against DHS must be dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and 12(h)(3). The Eleventh Amendment bars federal court jurisdiction over state law claims against nonconsenting states and state agencies. Cooper v. St. Cloud State Univ., 226 F.3d 964, 968 (8th Cir. 2000). Defendants thus contend that the MHRA claims must be dismissed without prejudice.

Norgren concedes that the Court lacks subject matter jurisdiction over the MHRA claims, and he agrees that the claims should be dismissed without prejudice. However, Norgren argues that the Court's dismissal of the MHRA claims should include language stating that the claims are tolled for statute of limitations purposes.

Given the lack of subject matter jurisdiction over the MHRA claims, the Court declines to issue any rulings concerning the statute of limitations or tolling issues. The MHRA claims are dismissed without prejudice.

### IV.  CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants Minnesota Department of Human Services and Commissioner Jodi Harpstead's Motion to Dismiss the Amended Complaint [Docket No. 19] is **GRANTED**;

2. Counts I through IV are **DISMISSED with prejudice**; and

3. Counts V and VI are **DISMISSED without prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

Dated: January 4, 2023

<u>s/Ann D. Montgomery</u>
ANN D. MONTGOMERY
U.S. DISTRICT COURT